174 N.J. Super. 211 (1980)
416 A.2d 62
IN THE MATTER OF THE GUARDIANSHIP OF J.R., A MINOR.
Superior Court of New Jersey, Appellate Division.
Argued March 10, 1980.
Decided April 25, 1980.
*214 Before Judges ALLCORN, MORGAN and FRANCIS.
Joseph B. Young argued the cause for appellant (Community Mental Health Law Project, attorney; David Lazarus, Director of Litigation; Joseph B. Young on the brief).
Brenda Talbot Lewis, Deputy Attorney General, argued the cause for respondent (John J. Degnan, Attorney General of New Jersey, attorney; Erminie L. Conley, Assistant Attorney General, of counsel; Brenda Talbot Lewis on the brief).
The opinion of the court was delivered by MORGAN, J.A.D.
This is an appeal by a natural mother from an order severing parental ties with and granting guardianship of her son J.R. (now seven years of age) to the Division of Youth and Family Services (DYFS) under N.J.S.A. 30:4C 15(c) and (d), in anticipation of his adoption by the foster parents with whom he has continuously lived since placement at six months of age. In an oral opinion delivered at the close of a plenary hearing the trial judge found that the mother had failed to plan for her child for at least a year as the basis for the severance.
The essential facts are as follows: J.R. was born on March 6, 1973 the second child of M.R. the appellant herein. The first child, Luis, was by a different father. Soon after J.R.'s birth the family unit moved into the paternal grandmother's house *215 where they lived for some time in increasing marital disharmony. The marriage was apparently a tempestuous one, marked by frequent arguments and little money, and in June 1973 appellant mother left the home.
After she left, two criminal complaints were lodged against her. One charged her with assault and battery on her husband, a charge ultimately withdrawn. The other charged an assault and battery against her first born son, Luis. The disposition of that charge is unclear. Although appellant does not remember doing so, the record suggests that she either pleaded guilty or was found guilty. In any event, the trial judge found these circumstances to be of no moment in reaching his conclusions in this matter:
... I do not in my deliberation consider the charge of abuse on Luis against M.R. I believe that the turmoil, havoc, she was in in 1973 should not in 1979 be used against her.
In July 1973 appellant corresponded with her estranged husband, seeking a reconciliation. Her husband responded. She appeared in court on August 15, 1973 to answer the assault charges against her first son and it was on this date that both parents agreed to place both children in the custody of DYFS until a joint decision between DYFS and the parents was reached. Visitation rights were to be arranged by DYFS and both parents agreed to have the children placed separately. Both parents agreed to accept casework services from DYFS and family counseling.
Ultimately Luis found his way to the home of his maternal grandparents. On November 1, 1973 J.R. was placed in the foster home where he has resided to this day. The trial judge viewed J.R.'s placement with DYFS as a voluntary one caused by the necessities of appellant's turbulent marriage and precarious finances.
Because the infrequency of appellant's visits with DYFS and J.R. provided one of the essential reasons for the trial court action, the events attendant thereto will be dealt with in greater *216 detail. Appellant did not attempt to visit her son until February 11, 1974, over three months after placement in the foster setting, when it appears that she called DYFS to report a change in her address. At this time she made her first request to visit J.R. and did so, in the DYFS office on March 11, 1974.
The next recorded communication by appellant was a phone call to the DYFS office in November 1974, about eight months after the prior visit with J.R. and a year after his placement with the foster family. The caseworker was not, however, in the office, and nothing was accomplished. Appellant relates an attempted contact in June 1974 in which she sought to visit J.R. but was rebuffed because she had failed to maintain contact. The DYFS case record does not reflect this attempt; the trial judge made no specific finding as to this fact.
Thus, after the March 11, 1974 visit, appellant's only corroborated contact was her fruitless call of November 1974. Her next contact with DYFS came more than 13 months later, after the case file had been assigned to a new social worker, in December 1975. The new social worker saw appellant for the first time on January 28, 1976. Hence, there was no contact between appellant and DYFS during the entire year of 1975 and DYFS claims to have been unaware of appellant's whereabouts.
Appellant's efforts to explain the reasons for her remoteness from her son and DYFS are somewhat less than satisfactory. She claims she had a miscarriage, tried to commit suicide and was hospitalized in October 1975. She also claims that in December 1975 she permanently broke off relations with her husband.
After meeting with her new social worker in January 1976, appellant started to maintain a more steady relationship with DYFS. She visited with her caseworker on February 4, 1976, February 13, 1976 and March 3, 1976. At these times appellant expressed her desire to have J.R. returned to her. Despite the absence of any adjudication of unfitness, or indeed any attempt *217 to obtain one, J.R. was not returned and, as the trial judge specifically found, visitation was repeatedly denied appellant. Thereafter, appellant's communications with DYFS continued on a more or less regular basis. On May 6, 1976 she telephoned her caseworker to tell her that she was now caring for her eldest child Luis. On June 24, 1976 she called her caseworker for an appointment, stating that she wanted J.R. returned. Because she worked and was unable to visit the DYFS office, her caseworker agreed to visit her home. She never did. Again, on September 7, 1976 appellant visited the caseworker, told her of a new address and wanted to know what was expected of her to get J.R. back. During this visit, counselling, adequate living quarters and day care were discussed. They did not, however, discuss visitation or J.R.'s return to appellant. Other visits to DYFS ensued on September 21, 1976 and October 19, 1976. On December 8, 1976, pursuant to the caseworker's suggestion, appellant made an appointment with the Elizabeth General Hospital Community Mental Health Center for December 14, 1976, an appointment which she failed to keep. A similar appointment was made for January 11, 1977 after she met with her caseworker on December 21, 1976, at which visit she signed a "contract" agreeing to certain conditions by certain dates, the failure of which would result in DYFS seeking guardianship of J.R. On January 11, 1977 appellant kept her appointment, became involved in group therapy and attended regularly thereafter. To this date in 1977, no effort had been made by DYFS to arrange visitation between J.R. and appellant.
During 1977 appellant's visits to DYFS continued on a fairly regular basis although no visitation with J.R. was arranged. On July 28, 1977 appellant signed another "contract" similar to the one signed on December 21, 1977. Ultimately, she met all "contract" requirements. On August 1, 1977 appellant obtained a new four-room apartment that was visited by her caseworker and determined to be satisfactory. Earlier in 1977 appellant's *218 caseworker had received letters from appellant's psychiatric counseling group advising that appellant had been keeping her appointments and that she was no longer in danger of losing her feelings. No visit with J.R. was arranged during all this time.
Appellant's caseworker testified that DYFS, between September 1977 and February 1978, was contemplating an evaluation of J.R. to see how a return to appellant would affect him. There is no question but that during this period of effort by appellant, 1976 and 1977, DYFS contemplated returning J.R. to appellant and that she was fully aware of its position. It was not until October 5, 1977 that she was first advised that the foster parents with whom J.R. had been living since November 1, 1973 wanted to adopt him. That news was greeted with alarm, appellant responding that she would not consider surrendering him and that she wanted his return.
On November 1, 1977 appellant met with her caseworker and the latter's supervisor, at which time she was again told of the foster parents' desire to adopt J.R., that the foster parents had retained legal counsel, that court action would follow and that any further planning would be held in abeyance.
An evaluation of J.R. by the DYFS psychologist, Dr. Edward Higgins, followed in January 1978. It must be borne in mind that during this entire two-year period, 1976-1977, J.R. had not visited with appellant despite her obviously sincere efforts to obtain his return. The last recorded visit was in March 1974. Indeed, as it turns out, J.R. had not even been told that he was a foster child and that those with whom he had been living were not his natural parents. Higgins testified that DYFS told him of its intention to return J.R. to appellant. His response, in his report and his testimony, was, not surprisingly, that J.R. was psychologically bonded to his foster parents and that uprooting him from this environment
... would be catastrophic for his psychological welfare and would eventuate in serious psychological problems. This youngster could not sustain such a loss without suffering serious emotional havoc.
*219 Higgins believed that J.R. was "vulnerable and would be dealt a deadly blow" if taken from the "only parents he knows." Higgins' report concludes that to "remove J.R. from his present home would be tantamount to cruel and inhuman punishment which could result in irreparable psychological damage."
On May 5, 1978 appellant was pronounced a fit parent with a good capacity to take care of her children and to raise them well by a Dr. Morelli to whom she was referred by the Community Mental Health Law Project. No contrary opinion evidence was adduced.
In the summer of 1978, appellant's psychologist, Dr. William Knaus, examined J.R. during which examination appellant and J.R. met. Dr. Knaus testified that although removing J.R. from his present home would sadden him, as it would any other child, nothing in his examination suggested that a "return to his mother would prove terrible or damaging ... or cause him to have repercussions throughout his life." Also, Dr. Knaus found it "hard to believe that there would be irreparable psychological damage."
In November 1978 a new caseworker took over the file. On December 7, 1978 a visit was arranged between J.R. and his mother, the first arranged by DYFS since March of 1974. At this time J.R. was over five years old, had for all practical purposes not seen his mother since August 1973, had lived with the same family all these years and did not know that the foster parents were not his only and real parents. During his visit appellant undertook to explain to J.R. that she was his mother. According to this caseworker, J.R. evidenced no reaction to this information, rejected the idea of living with her and said he wanted to go back to his family, "his mother and father." There was another visit on January 30, 1979. The record does not disclose any visits thereafter.
*220 Although the trial judge severed parental ties and granted DYFS guardianship of J.R., his oral opinion reflects the difficult, almost intractable, nature of the problem presented. He noted, with disapproval, the role played by DYFS in the very creation of the psychological parenthood upon which the ultimate determination largely rested. Nonetheless, being convinced that J.R.'s best interests would be served by keeping him in his present environment, he concluded that a severance of parental rights was the only proper disposition, using as the technical basis for the order the appellant mother's failure to plan for J.R. for a one-year period of time, 1974-1975. N.J.S.A. 30:4C-15(d).
At the outset we give explicit recognition to several factors which necessarily shape the disposition we feel constrained to reach. First and foremost is the situation of J.R., seven years of age at this writing. He was surrendered by appellant when only six months of age. Shortly after his surrender, he came into the custody of the foster parents with whom he still resides, a period of at least six years of his seven-year life. During most of this period, indeed until this past year, he was permitted to remain under the impression that his foster parents were his natural parents. Save for the few months before foster placement and one visit in 1974 thereafter, he did not see appellant until 1978, when he was five years old. Nothing in the record undermines the reality and strength of the psychological bond between J.R. and his foster and prospective adoptive parents.
The trial judge attempted compliance with prior case law requiring a threshold finding of parental unfitness as a necessary prerequisite to a termination of parental rights[1] by finding a failure on the part of mother to plan J.R.'s future for a period exceeding one year.
*221 N.J.S.A. 30:4C 15 provides, as here applicable:
Whenever ... (d) it appears that a parent ... following the acceptance of such child by the Bureau of Childrens Services ... and notwithstanding the diligent efforts of such agency to encourage and strengthen the parental relationship, has failed substantially and continuously or repeatedly for a period of more than 1 year to maintain contact with and plan for the future of the child, although physically and financially able to do so; a petition, setting forth the facts in the case, may be filed. .. .
N.J.S.A. 30:4C-20 goes on to provide the authority for terminating parental rights:
If upon the completion of such hearing the court is satisfied that the best interests of such child require that he be placed under proper guardianship, such court shall make an order terminating parental rights and committing such child to the guardianship and control of the Bureau of Children Services....
While the trial judge concluded that the State had established by clear and convincing evidence that appellant had not planned for her child for at least one year (the period of approximately 18 months after placement), no finding was specifically made that appellant's physical and financial capacity permitted her to make such plans and no specific finding was made as to DYFS's efforts to encourage and strengthen the parental relationship. Needless to say, the evidence as to the latter aspect points convincingly the other way, as the trial judge so emphatically pointed out. Indeed, the judge's criticism of DYFS and its failure to make any attempt to maintain, let alone strengthen the parental relationship suggests that DYFS did not and could not produce any evidence that it had fulfilled its statutory duty in that regard. As to appellant's physical and financial ability to plan for J.R., the record is bare of any evidence one way or the other. What is there suggests a highly volatile emotional state caused by a tempestuous marriage which continued unresolved for some time. Because DYFS, the party moving to terminate parental rights, has the burden of proof, we cannot agree with the trial judge that it has done so on this record. We, therefore, part company with the trial judge's conclusions *222 that the mother's failure to plan for J.R.'s future for over a year warrants the severance of parental rights.
We do not, however, disagree with the ultimate disposition reached by the trial judge despite the absence, at least in our view, of a fully adequate basis on which to charge the mother with unfitness at any time during the continuance of this foster placement. We should not, however, be understood as absolving the mother from all blame for the development of strong emotional bonds between J.R. and his foster family. The record clearly supports the conclusion that for almost two years after placement, she failed to make any effort to keep parental ties alive despite her knowledge that J.R. was residing with a foster family. Any mother should, in such circumstances, foresee the forging of strong ties of emotion, love and dependence between child and foster family, particularly in the absence of other ties, if strong and affirmative steps are not taken to prevent that from occurring.
One could conclude, with some justification, that the mother's failure to visit J.R. for almost two years after placement amounted to an abandonment in the legal sense and thus find, in that conclusion, the required unfitness as a predicate to terminating parental rights. The position is at least arguable, in our view. Nonetheless, we decline to so conclude because we recognize that the mother's placement of J.R. with DYFS was in response to her own awareness of her emotional inability to care for J.R. at that time. It was because she was not irresponsible, and cared for J.R.'s welfare, that she consented to the placement with DYFS. Although she should have understood the necessity of visiting J.R. to keep parental ties alive, we cannot view her failing to do so, in these circumstances, as abandonment in the statutory sense. The trial judge made no such finding.
*223 In any event, we choose not to rest our disposition on some arguable basis of unfitness despite our awareness of the line of decisional law which strongly suggests unfitness as a necessary predicate to a termination of parental rights. Rather, we conclude that where, as in this case, foster care has been permitted for so extended a period as to have resulted in the virtual creation of a new parent-child relationship, albeit not one based upon blood but upon love, affection and need, and a trial judge, with evidential justification, concludes that disruption of that new relationship, suddenly or gradually, would damage the child, an order permanently terminating the biological parent-child relationship can be validly issued despite the absence of present or past parental unfitness.
This holding is, in our view, entirely consistent with the practical effect of Sorentino v. Family & Children's Society of Elizabeth, 72 N.J. 127 (1976) (Sorentino I), and Sorentino v. Family & Children's Society of Elizabeth, 74 N.J. 313 (1977) (Sorentino II). Sorentino concerned a child, approximately three years old at adjudication, who had lived with adoptive parents uninterruptedly from the time she was one month old, a circumstance which, as was later noted, would alone deter a court from ordering her immediate return to her natural parents without some kind of protective hearing. Sees v. Baber, 74 N.J. 201, 221 (1977). The hearing, ultimately held as a result of Sorentino I, resulted in the expected conclusion that a transfer of custody would probably be attended with serious harm to the child. The court, without a specific finding of parental unfitness or abandonment,[2] nonetheless severed that natural parent-child relationship, and this based primarily upon the probability of damage to the child's well-being from a change in custody. *224 Critical to this disposition was the undeniable fact that there was no relationship between child and natural mother (save one of blood) because of the young age at which custody of the child had originally been surrendered.
The facts in the present case are, if anything, more compelling than they were in Sorentino. The child is now seven years of age and knows as parents only his foster parents. The mother's indifference, if that is what occasioned her failure to insist on visitation for almost two years, is at least as noteworthy as the Sorentinos' one year delay in bringing suit for their child's return. As stated in Sorentino in terms equally applicable to the difficult matter before us:
... Here, the passage of time permitted the roots to be nurtured and to develop fully. Hence it would appear that no policy of the [Adoption] Act would be ignored by the termination of plaintiffs' rights, should that eventually be deemed appropriate, because there can be no unnecessary separation from a nonexisting relationship. In that event, such termination would tend to promote the policy of preventing interference by establishing the little girl permanently in the home of her adoptive parents. [74 N.J. at 324-325]
There can be no solution satisfactory to all in this kind of case. Justice to both mother and child, the desired objective, can only rarely be attained where, as here, the best interest of one is only achieved at the expense of the other. Where courts are forced to choose between a parent's right and a child's welfare, they choose the child by virtue of their responsibility as parens patriae of all minor children, to protect them from harm. Sorentino I, 72 N.J. at 132.[3]
We experience no doubt concerning the conclusion, compelled not only by the weight of the evidence in this case but by common understanding and compassion as well, that J.R. would suffer greatly if wrenched from his home and from those with *225 whom he lives as parents. Whether his suffering would result in irreversible psychological damage is a prediction which we feel incapable of making. We see nothing in our statutory scheme which requires the attempted creation of a new psychological relationship with the natural mother at the cost of the child's present well-being in a well-established home in which the child is happy and flourishing.
Affirmed.
NOTES
[1] Sees v. Baber, 74 N.J. 201, 210 (1977); In re Adoption of Children by D., 61 N.J. 89, 95 (1972); J. and E. v. M. and F., 157 N.J. Super. 478, 490 (App.Div. 1978).
[2] The court did find the one year delay in bringing suit for the child's return "relevant in the consideration of the issue of abandonment and termination." Id. at 324.
[3] See Bennett v. Jeffreys, 40 N.Y.2d 543, 356 N.E.2d 277, 387 N.Y.S.2d 821 (Ct.App. 1976).