987 A.2d 536

**In re ADOPTION/GUARDIANSHIP OF ALONZA D., JR. and Shaydon S.**

**No. 41 Sept.Term, 2009.**

Court of Appeals of Maryland.

Jan. 19, 2010.

Marc A. DeSimone, Jr., Asst. Public Defender (Elizabeth L. Julian, Acting Public Defender, on brief), Baltimore, MD, for Petitioners.

Leslie K. Ridgway, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, on brief), Baltimore, MD; Janet Hartge (Legal Aid Bureau, Inc.), Baltimore, MD (as amicus) (Harriet G. McCullough, Lazarus & Burt, P.A., on brief), Baltimore, MD, for Respondents.

Brief of the amicus curiae, Legal Aid Bureau for Respondents: Janet Hartge, Esquire, Joan F. Little, Esquire, Legal Aid Bureau, Inc., Baltimore, MD.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, Judge.

In the present case, involving termination of parental rights, we are called upon to address one question on certiorari, that being:

> Where petitioner's sons were involuntary taken from his custody and, over his objections, were kept in the custody of a third party for six years, was it error for the lower court to find that this period of separation between father and sons, and the commensurate bonding between the children and the foster mother, was an exceptional circumstance sufficient to overcome the presumption that it is in the best interests of the children to preserve petitioner's inherent rights as a natural parent to the care, custody, and control of his sons?

*In re Adoption/Guardianship of Alonza D. Jr. and Shaydon S.,* 408 Md. 487, 970 A.2d 892 (2009). We conclude that the Circuit Court erred by failing to make explicit findings that a continued parental relationship would be detrimental to the best interests of the children, when concluding that "exceptional circumstances" existed under the standard established

in *In re Adoption/Guardianship of Rashawn H.*, to warrant terminating the Petitioner's parental rights.

## I. Facts and Procedural History

Petitioner, Alonza D., Sr. ("Mr. D.") was twenty-one years old, and his girlfriend, Lacole S. ("Ms. S.") was eighteen years old when Alonza D., Jr. ("Alonza") was born on March 13, 2000. The couple had a second child, Shaydon S. ("Shaydon")[1] on July 14, 2001. Alonza lived with his biological parents for the first sixteen months of his life, and Shaydon lived with them for approximately two months, before Mr. D. and Ms. S. separated in 2001. Ms. S. moved with Alonza and Shaydon to live with her two brothers, while Mr. D. moved in with his father and stepmother. Apparently, Mr. D. did not provide support for Alonza and Shaydon after the separation.

The Baltimore City Department of Social Services became involved with the children shortly after the couple separated, having received a report that the children were neglected and living in squalor. Although the Department considered placing Alonza[2] with Mr. D., a "Home Health Report" conducted by the Department indicated that the home in which Mr. D. resided was in need of a lead abatement, which did not occur. Thereafter, in early 2002, both children were placed in foster care with Cecilia B. ("Ms. B.").[3] The children were adjudicated children in need of assistance (CINA)[4] on May 6, 2002,

---

**1.** References to Shaydon's name are alternatively spelled as "Shaydon" and "Shayon" throughout the record. We shall use "Shaydon" for purposes of consistency.

**2.** Mr. D. initially sought custody only of Alonza, because he and Ms. S. believed that a Mr. E. was the biological father of Shaydon. A paternity test later confirmed that Mr. D. is Shaydon's father, and he has since sought custody of both children.

**3.** Pursuant to Section 3–815(a) of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2002 Repl.Vol.), "a local department may authorize shelter care for a child who may be in need of assistance," prior to a child in need of assistance (CINA) adjudication.

**4.** A child in need of assistance "means a child who requires court intervention because: (1) The child has been abused, has been neglect-

based upon reports that Ms. S. was living in deplorable conditions, was a suspected drug user, and permitted strangers to frequent the home.

A permanency plan,[5] established January 10, 2003, called primarily for reunification of the children with Ms. S. Mr. D. was referred by the Department in 2003 to a parenting program; the referral described Mr. D. as a "committed father with positive relationship with son—good work history—needs GED & improved parenting skills." Mr. D. did not complete the parenting classes, contending that they conflicted with his job and that class topics dealing with sexual and physical abuse were not applicable to him.

The plan also provided for Mr. D. to have visitation, which he exercised on a regular basis until 2007, when his parental rights were terminated. Sometime in late 2003, the permanency plan changed from reunification to placement with a nonrelative.

On March 17, 2004, the Department filed Petitions for Guardianship with the Right to Consent to Adoption, seeking termination of Ms. S's and Mr. D's parental rights. At the time, Alonza was four years old, Shaydon was two years and

---

ed, has a developmental disability, or has a mental disorder; and (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." Md.Code (1974, 2002 Repl.Vol.), Section 3–801(f) of the Courts and Judicial Proceedings Article.

**5.** After a child is determined to be a CINA, the court must establish a permanency plan for the child. Md.Code (1974, 2002 Repl.Vol.), Section 3–823(b) of the Courts and Judicial Proceedings Article. Pursuant to Section 3–823(e) of the Courts and Judicial Proceedings Article, the permanency plan for such a child may be one of the following, in descending order of priority:

    (i) Reunification with the parent or guardian;
    (ii) Placement with a relative for:
       1. Adoption; or
       2. Custody and guardianship;
    (iii) Adoption by a nonrelative;
    (iv) Guardianship by a nonrelative;
    (v) Continuation in a specified placement on a permanent basis because of the child's special needs or circumstances; ...

eight months old, and both had lived with Ms. B. for over two years.

The termination of parental rights (TPR) hearing was continued eight times between September 2004 and November 2006, due to the court's schedule, attorneys' schedules, or because one or both parents did not appear. During that period, in February 2006, Mr. D. moved from his father and stepmother's house to live with his girlfriend and her four children. Mr. D. also received another referral in July 2006 from the Department to attend parenting classes, which he did not complete.

On November 2, 2006, the Circuit Court for Baltimore City conducted a hearing regarding the termination of Ms. S's [6] and Mr. D's parental rights; neither Ms. S. nor Mr. D. attended. After hearing argument from both parents' counsel, as well as testimony from Department case worker, Angela Taylor, the trial judge issued an opinion from the bench, upon which the later decision with which we are concerned rests. The Circuit Court Judge made the following findings regarding Alonza's and Shaydon's safety and welfare:

> In terms of the factors, the primary consideration is the safety and health of the children. In this case the testimony of Ms. Taylor is really undisputed that they really are being taken care of in a safe fashion. They are healthy. They are currently living with Ms. [B.], who is the care taker and adoptive recourse. She has had them since, at least she has had one of the children since January 2002, the other since March of 2002. So they have lived a large chunk, a huge chunk of their lives with Ms. [B.] as the care taker for them.

The trial judge also considered the Department's efforts at reunification of the children with the father:

---

6. Although Ms. S. initially contested the termination of her parental rights, she later consented and entered into a mediation agreement with the foster care provider, Ms. B., providing for continued contact with the children.

[B]oth parents had regular visitation, there is no question that the Department both offered the visitation on a frequent basis and that the parents were generally compliant with the scheduling and did interact with the kids, I will get to the nuances of that in a second. But in terms of visitation that was complied with. Dad was also referred to parenting classes in 2003 and then again later in 2006. And the Court does take notice that it does appear to a certain extent reading between the lines, but maybe not even, maybe the lines themselves are indicating themselves that most recently regarding the Father was really looking at possible reunification. I don't think [the Department was] closing the door on that as of this past summer when they referred Mr. [D.] for parenting classes. Which is an indication to the Court that the Department in this case was probably bending over backwards to try and achieve reunification, one might argue, that they may have even done it beyond the point where it would have been feasible because of the length of time the children have been in Ms. [B.]'s home. But be that as it may for purposes of the [Section 5–313](c) factors it does appear that with Father they were in fact working very hard to see if they could achieve reunification. Probably some of that was due to the interaction that the worker had seen between the father and the children at the visitation.

The judge also characterized Mr. D's relationship with Alonza and Shaydon as "close":

It does sound like it was a close relationship. I think Ms. Taylor in response to some of the questioning by Father's counsel did not exactly indicate that it was a parent child relationship, however, did indicate that it was both appropriate in the sense of Father was clearly having fun with the kids and they were in a positive relationship. That is not quite the same as being a good parent, but it doesn't hurt. And I think that what Ms. Taylor was trying to get to when referring him in 2006, its pretty clear to the Court, was she was seeing I can see that you have this relationship with the children, show me you can parent, and maybe we have a

shot at this. And he didn't follow through. Whatever reason he had it seems to the Court that that was an opening that was given by the Department to allow him to maybe try to prove that he could actually pull this off, and unfortunately for him it wasn't successful.

\* \* \*

As far as the children's feelings toward ties with the parents, there was a distinction in the Court's mind between the father and the mother that does appear to have been much more of a warmer relationship not that the mother didn't love the children, but more of a loving relationship appeared between the father and the children, then necessarily the mother. There seemed to be some anger between Mom and the kids.

\* \* \*

The Father is a different story. It does appear as if he was trying his best, I just don't think he quite made it.

The judge then made the following findings regarding Alonza's and Shaydon's relationship with Ms. B.:

In terms of the children's adjustment to home, school, and community, they are in a loving relationship with Ms. [B.], they are bonded to her, they call her mommy, they feel safe, they are both in school, they are in private school, they are making their education, they go to church, this is a family. And they are living with Ms. [B.] as a family, as her two sons, and that seems to be quite evident.

The court next considered Mr. D's contact with the children:

As far as the efforts made by the parents to adjust their circumstances, their conduct, to make it in the best interest to return the children to the home, the first factor is whether the parents have maintained regular contact under the plan to reunite. There has been in fact regular visitation. The visitation that has been provided by the Department appears to have been taken up readily by both parents, there hasn't been any hesitation on their part. There has been no evidence of any financial payment for the care of the children. There has been some evidence of some

incidental contributions, but nothing of any significance. There has been communication between the parents and the custodian of the children. In fact it appears, at least from the testimony of Ms. Taylor, that there is in fact communication between both of the parents and Ms. [B.]. That there does appear to have been efforts—there do appear to have been efforts made by at least the Father and Ms. [B.] to try to come to some kind of agreement.

\* \* \*

Mr. [D.] is employed and has been regularly employed so that has not been an issue as far as he is concerned and has not been part of the services that were offered [by the Department] because he has had a job for some time. But the real issue with him is in terms of the parenting classes and also getting his home ready. The home was really never approved. There was a home health report which indicated that the home was not satisfactory where he was, which was with his father. He is currently with his partner. And I think that the testimony, at least on that end right now is that, that home is acceptable.

Based upon these findings, the Circuit Court Judge terminated Mr. D.'s parental rights in the children's "best interests":

The Court does also find that under the circumstances in this case that the Department has proven by clear and convincing evidence that it is in Shaydon and Alonza's best interest to grant the Department's petition and accordingly the Court does issue an Order to the Baltimore City Department of Social Services with the right to consent to adoption or long term care short of adoption, thereby terminating the natural and parental rights of [Mr. D.] and [Ms. S.].

Mr. D. filed a Motion for Reconsideration, asserting he arrived at the courthouse on November 3, the day after the judge rendered his decision, believing that the hearing was scheduled for that day, and requesting permission to present testimony. The Circuit Court granted the Motion, set aside

the TPR Order, and a second TPR hearing was held on February 8, 2007, at which both Ms. S. and Mr. D. offered testimony. Mr. D. testified that he was living with his girlfriend and her four children and that their home had three bedrooms with sleeping arrangements for all of the children. He further testified that he had been working for the past five years and was currently earning $44,000 per year, with medical and dental benefits which Alonza and Shaydon would be eligible to receive. Mr. D. also testified that he had arranged for day care services and enrollment in the local elementary school for the boys. The Circuit Court Judge, however, adopted all of his findings from the previous hearing and again terminated Mr. D's parental rights, emphasizing the length of time the children had been in foster care:

> I did say then and I do say today that it is a sad case and it's a sad case because as far as at least the parents go today, particularly Mr. [D.], he is in a position today, and it's just so sad because I have to say this to many parents and I need to say it to you Mr. [D.], *if it takes that long, and it has taken that long, these children have a mother now, and she has raised them. And that is the problem that the clock is ticking and the time goes forward and the children bond with the foster parents, and it's extremely sad.*

(Emphasis added).

Mr. D. filed an appeal to the Court of Special Appeals, asserting that the Circuit Court erred in affording too much weight to the bond that had developed between Ms. B. and the children. A divided panel of the intermediate appellate court affirmed the decision in an unreported opinion. We granted certiorari and subsequently issued a per curiam order on February 15, 2008, *In re Adoption/Guardianship of Alonza Lynn D., Jr. and Shaydon Stevie S.*, 403 Md. 424, 942 A.2d 755 (2008), vacating the Court of Special Appeals' decision, and remanding the case to the Circuit Court for reconsideration in light of *In re Adoption/Guardianship of Rashawn H. and Tyrese H.*, 402 Md. 477, 937 A.2d 177 (2007). Thereafter, Mr. D. filed a "Motion for Immediate Hearing" in the Circuit Court, requesting visitation with Alonza and Shaydon and

asserting that telephone calls and letters to the Department regarding resumed visitation had gone unanswered.

The Circuit Court thereafter, on July 29, 2008, held another hearing in which the judge considered Mr. D's Motion as well as the termination of Mr. D's parental rights in light of *In re Adoption/Guardianship of Rashawn H.*, as directed by this Court. Mr. D. was not present.[7] After hearing testimony from Ms. B. as well as argument from Mr. D's counsel explaining efforts by Mr. D. to exercise visitation, the trial judge delivered an opinion from the bench, incorporating by reference his November 2006 and February 2007 findings. The court first framed the issue in light of *In re Adoption/Guardianship of Rashawn H.:*

> Specifically, what the Court [of Appeals] had said was that there's a presumption that the parent/child relationship should continue and that presumption can only be overcome by clear and convincing evidence that the parent was either unfit or that exceptional circumstances existed so as to allow for the parent/child bond, relationship to be severed.

The judge then determined that there was no evidence suggesting that Mr. D. was an "unfit" parent:

> [T]he evidence at the time of the hearings—and I stress that, because that's really—what I saw of Mr. [D.] was at the time of the hearing and he testified that in fact he is working and he does live with his partner, who has a few kids, and appeared to be sort of, you know, what I'll characterize as a relatively normal relationship for purposes of proceeding and there was no indication at that time that there was anything which would question the fitness of Mr. [D.].
>
> * * *
>
> And my view of it is that I think that the Court is, when it talked about unfitness, it's really speaking to is this, does

**7.** Prior to the July 29, 2008 hearing, Ms. S. had consented to termination of her parental rights and was excused by the Circuit Court from attendance.

this parent have the emotional, physical, mental ability to be a parent for this child. And as I saw Mr. [D.] here on that day, he did. I mean, he was—I'm not questioning and I don't think the Department is really questioning whether or not he, in fact, at that time had the ability to be a fit parent.

So it's really, to me, this is an issue of exceptional circumstances and whether or not exceptional circumstances exist in this case in order to sever the parent/child relationship.

Rather, in terminating Mr. D's rights once again, the judge emphasized, as he had done in his earlier ruling, that the length of time Alonza and Shaydon were in foster care constituted "exceptional circumstances," warranting the termination of Mr. D.'s parental rights:

*But in looking at the issue, what is the most serious concern to the Court is just the length of time that the children have been away from the care of the father and in the care of the father. I think only one of them was actually in the care of Mr. [D.]. They've really been with Ms. [B.] since 2002. Mr. [D.]'s contact with the children has admittedly been in the form of visitation.*

*But it's really, to a large extent, the Court finds that it was really within Mr. [D.]'s control through a lot of that to be able to take care of this. It was within his control to take the parenting classes to do what was required, to fix the housing to do what was required. He was at one point in time making a significant amount of money, relatively speaking, compared to some of the folks that, the clients that we have in this Court.*

*And what is of concern to the Court as far as the length of time was that it was so much within his control to take care of this. [H]e took care of things, but he took care of them late and I think I spoke to him about that when he was, in my closing, in my decision in February 2007. There's a clock ticking and, you know, it was almost as though Mr. [D.] sort of woke up at some point and said he was going to take care of this, but in the meantime, these*

*children have been living with Ms. [B.] for a long time. Now it's six years.*

\* \* \*

My overall task, from the law and from the case law, is what is in the best interests of the children. I do have to—and I have addressed this issue concerning the exceptional circumstances in this case. I do find that exceptional circumstances exist in this case to sever the parent/child relationship and I find that by clear and convincing evidence, the Department has shown that.

*Also, along with that is that I have to look at what's in the best interests of these children and I think that relates back to the length of time that these children have been in the care of Ms. [B.], the relationship that they have with her as a parent, them as a child, and also the, the extent to which the parent has, in fact, shown a genuine desire and made steps in order to prevent the severance of that parent/child relationship. And I do not believe that Mr. [D.] has done that, but I also am finding that, based upon the length of time that these kids have been with Ms. [B.], that I do believe exceptional circumstances exist and I am going to, again, issue an Order in light of the Rashawn H. case that the Department's Petition shall be granted.*

(Emphasis added).

Mr. D. appealed to the Court of Special Appeals, and again a divided panel affirmed the Circuit Court's decision in an unreported opinion. The majority reasoned that when evaluating "exceptional circumstances" under the standard enunciated in *In re Adoption/Guardianship of Rashawn H.*, the best interests of the children are ultimately determinative, and "it would be a stone-hearted constitution that, under the circumstances here, would take these children from a loving foster mother after they have bonded with her for over six years." The majority further reasoned that the length of time the children had been in foster care, Mr. D.'s failure to complete parenting classes, and his inaction in abating the lead in the home in which he resided, weighed in favor of terminating Mr.

D.'s parental rights. In his dissenting opinion, Judge Arrie W. Davis emphasized that parental rights are deemed "fundamental" and reasoned that the evidence presented "simply did not warrant this most drastic and permanent of legal interventions in the relationship between a natural parent and a child," and that a finding of "exceptional circumstances" requires evidence demonstrating that a "continued parental relationship [is] *detrimental to the child's best interest.*" (emphasis in original).

## II. Discussion

Mr. D. argues that the Circuit Court and Court of Special Appeals erred in identifying the length of time Alonza and Shaydon had been in foster care and the children's apparent bond with Ms. B. as exceptional circumstances, warranting termination of his parental rights. He relies on the presumption that it is in the best interests of children to remain in the care and custody of their parents and asserts that the Department failed to meet its evidentiary burden that continuation of the parental relationship would prove detrimental to the best interests of Alonza and Shaydon.

The Department counters that the statutory factors outlined in Section 5–313 of the Family Law Article, Maryland Code (1984, 2004 Repl.Vol.), weigh in favor of terminating Mr. D.'s parental rights. It characterizes Mr. D. as "an absent father," who "has failed to assume parental responsibilities." The Department further emphasizes that Mr. D. and his sons have been separated for nearly eight years, and that a "lengthy parent-child separation and a corresponding growth in ties between a child and his prospective adoptive parents, such that the child would suffer serious and lasting emotional or psychological harm," constitutes exceptional circumstances. Counsel for Alonza and Shaydon echoes this argument and asserts that Mr. D.'s failure to attend parenting classes and provide financial support for his children indicates his lack of "intensity and genuineness" to reclaim them.

In *In re Adoption/Guardianship of Rashawn H. and Tyrese H.*, 402 Md. 477, 937 A.2d 177 (2007), the case that the Circuit

Court applied on remand, as requested, this Court considered the contours of Section 5–313 of the Family Law Article, Maryland Code (1984, 2004 Repl.Vol.),[8] governing the termination of parental rights. Section 5–313 stated in relevant part:

> (a) *In general.*—A court may grant a decree of adoption or a decree of guardianship, without the consent of a natural parent otherwise required by §§ 5–311 and 5–317 of this subtitle, if the court finds by clear and convincing evidence that it is in the best interest of the child to terminate the natural parent's rights as to the child and that:
>
> (1) the child is abandoned as provided in subsection (b) of this section;
>
> (2) in a prior juvenile proceeding, the child has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child; . . .
>
> \* \* \*
>
> (c) *Required considerations.*—In determining whether it is in the best interest of the child to terminate a natural

---

**8.** All references to Section 5–313 throughout are to the Family Law Article, Maryland Code (1984, 2004 Repl.Vol.), unless otherwise noted. In 2005, the General Assembly enacted the Permanency for Families and Children Act of 2005, which substantively revised the laws relating to guardianships and the termination of parental rights. The factors previously established in Section 5–313, as revised, were recodified in Section 5–323 of the Family Law Article, Maryland Code (1984, 2006 Repl.Vol.). Section 4 of the Act provides that the Act did not apply to any case pending on January 1, 2006, and that such cases "shall be governed by the law applicable as if this Act had not become effective." 2005 Md. Laws, Chap. 464. Because the Department's petitions were pending on January 1, 2006, the case is governed by the provisions in the former Section 5–313 of the Family Law Article.

Section 5–323 was amended by Chapter 350 of the Maryland Laws of 2009, authorizing termination of parental rights if a juvenile court finds by clear and convincing evidence that "a parent is unfit to remain in a parental relationship with the child or that exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child. . . ." Md.Code (1984, 2006 Repl.Vol., 2009 Supp.), Section 5–323(b) of the Family Law Article. Section 5–323 explicitly incorporates the "unfit[ness]" or "exceptional circumstances" standard we enunciated in *In re Adoption/Guardianship of Rashawn H. and Tyrese H.*, 402 Md. 477, 937 A.2d 177 (2007).

parent's rights as to the child in any case, except the case of an abandoned child, the court shall give:

(1) primary consideration to the safety and health of the child; and

(2) consideration to:

(i) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(ii) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(iii) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(iv) the child's adjustment to home, school, and community;

(v) the result of the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

1. the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give significant weight to any incidental visit, communication, or contribution;

2. if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

3. the maintenance of regular communication by the natural parent with the custodian of the child; and

4. whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months from the time of placement, but the court may not consider whether the maintenance of

the parent-child relationship may serve as an inducement for the natural parent's rehabilitation; and

(vi) all services offered to the natural parent before the placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals.

(d) *Considerations following juvenile adjudication.*—(1) In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in a case involving a child who has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child, the court shall consider the factors in subsection (c) of this section and whether any of the following continuing or serious conditions or acts exist:

(i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time;

(ii) the natural parent has committed acts of abuse or neglect toward any child in the family;

(iii) the natural parent has failed repeatedly to give the child adequate food, clothing, shelter, and education or any other care or control necessary for the child's physical, mental, or emotional health, even though the natural parent is physically and financially able; . . .

In *In re Adoption/Guardianship of Rashawn H.,* the rights of Melissa F. as to two of her four children, Rashawn and Tyrese, who were then six and five years of age, respectively, had been terminated by order of the Circuit Court for Frederick County.

Melissa F., as we noted, suffered from a series of interrelated problems, including "an overall IQ of 66, an oppressive childhood, eviction from and apparent disqualification for Government assisted housing because of her drug-dealing mother, life-long poverty, inability to maintain steady employment, and lack of a reliable support system." *Id.* at 481, 937 A.2d at 180. Melissa F. had turned Rashawn and Tyrese over to the

Department rather than allow them to go "homeless and hungry," and they were then adjudicated CINA. *Id.* at 483–84, 937 A.2d at 181. Because Ms. F. was unable to maintain employment and secure adequate housing, the Department initiated TPR proceedings, during which the trial judge noted, pursuant to Section 5–313(c), that Melissa F. had made several failed attempts to secure housing and lacked financial resources to provide for the children's financial and material needs, and that, under Section 5–313(d), she had a disability that limited her ability to care for the children. Evidence had also been adduced that Rashawn exhibited "aggressive and sexualized behaviors," and that the children's adjustment to their foster homes was "troubling," but improving. The court ultimately determined that termination of Melissa F.'s parental rights was in the best interests of the children, and our intermediate appellate court affirmed. 402 Md. at 488–94, 937 A.2d at 184–87.

We reversed, reasoning in a termination of parental rights proceeding, unlike in custody or visitation disputes, that at stake is "a total rescission of the legal relationship between parent and child." *Id.* at 496, 937 A.2d at 188. We determined that there are "three critical elements in the balance that serve to give heightened protection to parental rights" in TPR cases. "First and foremost" amongst these is the "substantive presumption that the interest of the child is best served by maintaining the parental relationship, a presumption that may be rebutted only by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest." *Id.* at 498, 937 A.2d at 190. We also acknowledged that unfitness or exceptional circumstances must be proven by clear and convincing evidence:

> [I]n a TPR case, the kind of unfitness or exceptional circumstances necessary to rebut the substantive presumption must be established by clear and convincing evidence, not by the mere preponderance standard that applies in custody cases. The State must overcome a much higher substantive burden by a higher standard of proof.

*Id.* at 499, 937 A.2d at 190. Statutory restrictions set forth in Sections 5–313(c) and (d), limiting the trial judge's discretion to terminate parental rights, comprised the third safeguard of the fundamental right to parent:

> Third, and of critical significance, the Legislature has carefully circumscribed the near-boundless discretion that courts have in ordinary custody cases to determine what is in the child's best interest. It has set forth criteria to guide and limit the court in determining the child's best interest— the factors formerly enumerated in FL § 5–313(c) and (d) and now stated in FL § 5–323. Those factors, though couched as considerations in determining whether termination is in the child's best interest, serve also as criteria for determining the kinds of exceptional circumstances that would suffice to rebut the presumption favoring a continued parental relationship and justify termination of that relationship.
>
> * * *
>
> What the statute appropriately looks to is whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare. As former FL § 5–313(c)(1) and current § 5–323(d) make clear, primary consideration must be given to "the safety and health of the child."

*Id.* at 499–500, 937 A.2d at 190–91.

In reversing the judgment terminating Ms. F.'s parental rights, we found dispositive the trial court's failure to relate specific findings relevant to the statutory factors to a determination of parental unfitness or exceptional circumstances that would make a continuation of the parental relationship detrimental to the best interests of the children. Section 5–313(c), we noted, required that the trial court "give primary consideration to the safety and health of the children." *Id.* at 503, 937 A.2d at 193. The circuit court apparently resolved that factor, we concluded, by emphasizing the children's "special needs," which would be "better served by granting the Department the guardianship," but did not articulate how the Department

could better meet those needs if guardianship to another was ordered rather than if Ms. F. were to retain her parental rights. *Id.* at 504, 937 A.2d at 193.

Similarly, regarding Section 5–313(c)'s consideration of the children's "feelings toward and emotional ties with the [children's] natural parents," the circuit court found that it was "not sure" Rashawn and Tyrese had much attachment left to Melissa F, but we had reasoned that such a finding was not adequate, "[g]iven the State's burden to establish by clear and convincing evidence" either unfitness or exceptional circumstances. *Id.* at 504, 937 A.2d at 193–94. We instructed the circuit court, on remand, to relate its findings as to the statutory factors to circumstances rebutting the parental presumption, namely parental unfitness or exceptional circumstances, that would make continuation of the parental relationship detrimental to the best interests of the children. *Id.* at 505, 937 A.2d at 194.

In the present case, while highlighting Mr. D.'s failure to complete parenting classes, as well as his inaction in abating the presence of lead in his former residence, the judge primarily focused upon Section 5–313(c)(2)(iii), "the child's feelings toward and emotional ties with the child's natural parents," and Section 5–313(c)(2)(iv), "the child's adjustment to home, school, and community," finding that the length of time Alonza and Shaydon had been in foster care, coupled with their apparent bond with Ms. B., amounted to exceptional circumstances, warranting termination of Mr. D.'s parental rights. The judge, however, failed to explore the children's feelings and emotional ties with Mr. D. through discussion with them or through the testimony of an expert and also failed to articulate any finding that a continued parental relationship with him would prove detrimental to their best interests. During oral argument it was admitted that the children were never heard in this case. The issue, then, is whether the Circuit Court's finding that the length of time the children have been in foster care is sufficient to satisfy a determination of exceptional circumstances, absent any finding that a continued relationship with Mr. D. would be detrimental to the

children. The answer must be no, based upon our reasoning in *McDermott v. Dougherty*, 385 Md. 320, 869 A.2d 751 (2005).

In *McDermott*, maternal grandparents, the Doughertys, filed a complaint seeking third party custody of their seven year old grandson, Patrick, claiming that the child's father, Charles McDermott, was unable to properly care for him because of Mr. McDermott's months-long absences at sea due to his merchant marine work. The circuit court granted sole legal and physical custody of Patrick to the Doughertys, reasoning that Mr. McDermott's long departures jeopardized "stability in [Patrick's] living arrangements," constituting exceptional circumstances. *Id.* at 331, 869 A.2d at 757. We reversed. In doing so, we explored sister states' application of the "best interests of the child standard" and concluded that Maryland embraced the majority view, that being:

> [B]ecause of the presumption that natural parents are fit to raise their children and/or because natural parents have a fundamental constitutional right to raise their children, or both, there must first be a finding that the natural parents are unfit, or extraordinary circumstances detrimental to the welfare of the child must first be determined to exist, before the "best interest of the child" test may be applied when private third-parties dispute custody with natural parents.

*Id.* at 375, 869 A.2d at 783. Applying this standard, which we also articulated in *In re Adoption/Guardianship of Rashawn H.*, we reasoned that the circuit court inappropriately failed to afford Mr. McDermott "the presumptive benefits of a natural parent," particularly a "fit natural parent," by equating exceptional circumstances "with the absences occasioned by [his] merchant marine work." *Id.* at 423, 869 A.2d at 811. In other words, the mere passage of time during which Mr. McDermott and his son were separated did not rise to the level of exceptional circumstances overcoming the legal presumption favoring parental custody, especially in light of the determination that Mr. McDermott, as with Mr. D., was a fit parent.[9]

---

9. Respondent relies on *Ross v. Hoffman*, 280 Md. 172, 372 A.2d 582 (1977), in which we affirmed the award of custody to a nonparent,

We further noted that if Mr. McDermott's prolonged absences at sea indeed constituted exceptional circumstances, then military service men and women, as well as parents engaged in "a myriad of other vocations," might be compelled to forfeit custody of their children simply because of their length of time apart. *Id.* at 426 & n. 45, 869 A.2d at 813 & n. 45.

Clearly, if passage of time, especially in the absence of any finding, relative to detriment to the children as here, was insufficient to overcome the parental presumption in *McDermott*, when third-party custody was involved, then certainly here, in which we are faced with the termination of parental rights, "a total rescission of the legal relationship between parent and child," it remains insufficient to terminate Mr. D.'s parental rights. *In re Adoption/Guardianship of Rashawn H.*, 402 Md. at 496, 937 A.2d at 188. *See also In re James G.*, 178 Md.App. 543, 603–605, 943 A.2d 53, 87–89 (2008) (reasoning that the circuit court erred in changing the child's permanency plan from parental reunification to placement with a relative based upon "the length of time" the child had been in

---

rather than a parent, when faced with sufficient evidence that parental custody would prove detrimental to the child's well being. In that case, Mrs. Ross placed her infant daughter, Melinda, in the care of Mr. and Mrs. Hoffman while she worked nights, and eventually Melinda resided with the Hoffmans full time for more than eight years. We affirmed the circuit court's judgment awarding custody to Mr. and Mrs. Hoffman, relying on testimony by the Hoffman's expert witness, Dr. Derivan, that "[w]hen the mother attempted to reclaim the child, the child's reaction 'was one of emotional upheaval. She was under emotional stress.' " *Id.* at 182, 372 A.2d at 589. Although we recognized that "the length of time the child has been away from the biological parent" could be considered under the exceptional circumstances standard, we emphasized that evidence regarding "the emotional reaction of the child to the dispute over her custody and the possible emotional effect on her if the change were made" clearly indicated a detriment to Melinda's best interests should Mrs. Ross assume custody. *Id.* at 191–92, 372 A.2d at 593–94. The present case is distinguishable, because findings regarding any detriment to Alonza and Shaydon should the parental relationship continue, were not made. *See also Shurupoff v. Vockroth*, 372 Md. 639, 645–46, 814 A.2d 543, 547 (2003) (affirming custody in a twelve year old child's maternal grandparents over the objections of her biological father when the trial judge interviewed the child in chambers, learning that she viewed her grandparents as her "second mom and dad," and that she was not close to her father).

foster care). Passage of time, without explicit findings that the continued relationship with Mr. D. would prove detrimental to the best interests of the children, is not sufficient to constitute exceptional circumstances.[10] It is worthy to note

**10.** Respondent argues, citing *Sider v. Sider*, 334 Md. 512, 639 A.2d 1076 (1994), *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), and *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 701 A.2d 110 (1997), for the proposition that Mr. D. is not entitled to the parental presumption, because he "has failed to assume parental responsibilities." In *Sider*, we considered whether the circuit court erred by denying the paternity petition of a third party, the putative father, when the child's mother and her former husband had already filed a complaint for divorce. We reasoned that the circuit court should have balanced the putative father's "interest in personal contact with his child" against "the interest of the presumptive father, and his family, in maintaining an already formed familial relationship." *Sider*, 334 Md. at 527–28, 639 A.2d at 1083–84 (quotations omitted). We concluded that the circuit court had erred in denying the petition, because the biological father had a significant interest in establishing a relationship with his son and because there was "no family integrity to protect," given the pending divorce complaint. *Id.* at 528–29, 639 A.2d at 1084. *Sider* is entirely consistent with our holding in this case in its emphasis on the best interests standard and the requirement that the relationship of the child with the biological parent must be considered.

In *Lehr*, at issue was a petition to vacate an adoption order filed by a child's biological father, who asserted he had not gotten the requisite notice of adoption under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The Supreme Court rejected the father's claim, reasoning that he was not denied due process under New York law, because he had failed to file with the "putative father registry," which provided a mechanism by which fathers could claim paternity of a child born out of wedlock. *Lehr*, 463 U.S. at 250–51, 103 S.Ct. at 2987–88, 77 L.Ed.2d. at 619–20. Insofar as the Equal Protection claim was involved, the Court determined that it was not discriminatory for New York to accord two parents different legal rights. *Id.* at 267–68, 103 S.Ct. at 2996–97, 77 L.Ed.2d. at 630–31. The Court's discussion about the father's abandonment of the child in that case is neither legally nor factually apt in our case.

In *In re Adoption/Guardianship No. 3598*, we considered an independent adoption arranged by a child's biological mother, who resided in New York, in which the child was taken to Maryland where the prospective adoptive parents were granted a decree of adoption. The child's biological father sought to dismiss the adoption petition, asserting that the adoption was granted by the circuit court in violation of the Interstate Compact on the Placement of Children (ICPC), because the child was taken from New York without approval from the Maryland ICPC administrator. *In re Adoption/Guardianship No. 3598*, 347 Md. at 307–10, 701 A.2d at 116–118. We reasoned that the circuit court did

that presumably, a successful foster care placement has as its foundation a level of bonding by the children with the caretaker. Were bonding to be the dispositive factor, without consideration of whether a continued relationship with the biological parent would be detrimental to the best interests of the children, then reunification with a parent would be a mere chimera. Certainly, such a result represents a violation of Section 5–313 and its specific requirement that a court consider "the child's feelings toward and emotional ties with the child's natural parents . . . ."

In so holding, we find succor in cases similar to the case *sub judice*, from sister jurisdictions identified in *McDermott*, 385 Md. at 375, 869 A.2d at 783, as having a requirement analogous to our own of a finding of parental unfitness or exceptional circumstances to overcome the legal presumption in favor of the parental relationship. In *R.Y. v. Indiana Department of Child Services*, 904 N.E.2d 1257 (Ind.2009), the Indiana Supreme Court considered whether the length of time a child had been in foster care warranted the termination of his mother's parental rights. In that case, R.Y. gave birth to a son, G.Y., in April 2004, and was the child's sole caretaker

not abuse its discretion in granting the adoption petition, applying factors established in former Section 5–312 of the Family Law Article, Maryland Code (1984, 1991 Repl.Vol., 1997 Supp.), governing independent adoptions. We concluded that the circuit court properly applied the best interests standard, noting that the court made an explicit finding of detriment to the child should she be turned over to her biological father. *Id.* at 327–30 & n. 18, 701 A.2d at 126–27 & n. 18. *In re Adoption/Guardianship No. 3598* is wholly consistent with our holding in this case in its requirement of a finding that a continuation of the parental relationship with Mr. D. would be detrimental to the best interests of the children.

Finally, in a related argument, Respondent asserts, citing *In re Adoption/Guardianship No. A91–71A*, 334 Md. 538, 561, 640 A.2d 1085, 1096 (1994), that in termination of parental rights proceedings, "the paramount consideration is what will best promote the child's welfare, a consideration that is of 'transcendent importance,'" and argues that Mr. D. has "focused exclusively on his own needs rather than those of his children," and therefore deserves to have his parental rights terminated. In this case, we underscore that the children's welfare continues to be of paramount concern and that detriment to the children must be found were they to continue their relationship with Mr. D.

during the first twenty months of his life. Prior to G.Y.'s birth, in April 2003, R.Y. had delivered cocaine to a police informant, for which she was arrested and incarcerated in December of 2005. G.Y. was placed in foster care in 2005 and more than a year later, the State filed a "Petition for Termination of the Parent–Child Relationship." *Id.* at 1259. The trial court granted the State's Petition, concluding that termination of R.Y.'s parental rights was in G.Y.'s best interests, because "[t]o provide Mother additional time to be released from jail and try to remedy conditions would only necessitate [G.Y.] being put on a shelf instead of providing paramount permanency." *Id.* at 1263 (alterations in original).

The Indiana Supreme Court reversed, emphasizing that in termination of parental rights cases, the State must show by clear and convincing evidence that "the child's emotional and physical development are threatened" by continued custody of the natural parent. *Id.* at 1261. The court reasoned that R.Y. had taken steps while in prison to complete services required for reunification, and that "the amount of time that it will likely take Mother to comply" with further conditions, was not "a sufficiently strong reason" to terminate her parental rights. *Id.* at 1263–64. The Court also rejected the trial court's conclusion that because G.Y. had lived in foster care since he was less than two years old, termination of R.Y.'s parental rights was in the child's best interests, reasoning that the bond that had developed between G.Y. and his foster parents was not dispositive:

> We do not find the fact that G.Y. currently has a closer relationship with his foster parents than he does with Mother to be a sufficiently strong reason . . . to warrant a conclusion by clear and convincing evidence that termination of Mother's parental rights is in G.Y.'s best interests.

*Id.* at 1265. As a result, neither the length of time G.Y. had been in foster care nor the bond that had developed between G.Y. and his foster parents, either alone or in conjunction, warranted a conclusion by clear and convincing evidence that termination of the mother's parental rights was in the child's best interests. *Id.* at 1265–66.

In *In the Matter of the Guardianship of J.C., J.C., and J.M.C.*, 129 N.J. 1, 608 A.2d 1312 (1992), further, the New Jersey Supreme Court considered whether termination of a mother's parental rights was warranted when her children had lived in foster care for more than five years. In that case, A.C. had three children, two girls, J.C. and J.M.C. born in 1983 and 1985, respectively, and J.C., a boy, born in 1986. Facing homelessness, domestic abuse, and her own substance abuse, A.C., in 1986, placed all three children in foster care with the Division of Youth and Family Services (DYFS). Three years later, DYFS initiated termination proceedings, concluding that because of her abusive husband and continued drug addiction, A.C. could not properly care for the children. Although, A.C. had consented to the adoption of her son, J.C., she had not as to the two girls.

The trial court terminated the mother's parental rights as to the girls, J.C. and J.M.C., reasoning that the children had forged new bonds with their foster parents and would suffer psychological harm if returned. *Id.* at 1314. The New Jersey Supreme Court reversed, reasoning that the termination of parental rights is only appropriate when the State clearly and convincingly demonstrates that " 'the child's best interests will be substantially prejudiced' if parental rights are not terminated." *Id.* at 1315, 1323–24, quoting *New Jersey Division of Youth and Family Services v. A.W.*, 103 N.J. 591, 512 A.2d 438 (1986). The Court rejected the trial court's focus upon the potential harm, based upon separation from a foster parent, as determinative:

> To the extent that the quality of the child's relationship with foster parents may be relevant to termination of the natural parents' status, that relationship must be viewed not in isolation but in a broader context that includes as well the quality of the child's relationship with his or her natural parents. As suggested by *In re Guardianship of J.R.*, 174 N.J.Super. 211, 223, 416 A.2d 62 (App.Div.1980), prolonged inattention by natural parents that permits the development of disproportionately stronger ties between a child and foster parents may lead to a bonding relationship the sever-

ing of which would cause profound harm—a harm attributable to the natural parents and cognizable under the standards set forth in [*New Jersey Division of Youth and Family Services v. A.W.,*] 103 N.J. [591], 604–11, 512 A.2d 438 [(1986)]. To show that the child has a strong relationship with the foster parents or might be better off if left in their custody is not enough. *See In re Baby M.,* 109 N.J. 396, 445, 537 A.2d 1227 (1988). DYFS must prove by clear and convincing evidence that separating the child from his or her foster parents would cause serious and enduring emotional or psychological harm. *Santosky [v. Kramer,* 455 U.S. 745, 768, 102 S.Ct. 1388, 1402, 71 L.Ed.2d 599, 616–17 (1982)]; *see also Division of Youth & Family Servs. v. T.C.,* 251 N.J.Super. 419, 440, 598 A.2d 899 (App.Div.1991) ("termination [justified] in order to spare the child grievous and irreparable psychological harm").

*Id.* at 1320.

The court concluded that expert testimony, assessing both the child's relationship with the foster parents as well as with his or her natural parents would be appropriate to be adduced to measure potential psychological harm. *Id.; see also Adoption of Rhona,* 57 Mass.App.Ct. 479, 784 N.E.2d 22, 32–33 (2003) ("The bonding of children with their foster parents cannot be the dispositive factor in these cases because the very fact of placing a child in foster care during judicial proceedings would in every case determine the outcome of those proceedings."); *In the Interest of J.R.,* 478 N.W.2d 409, 414 (Iowa Ct.App.1991) (reasoning that although the Legislature considered bonding of a child to its foster parents in the termination process, that provision was not intended "to be elevated to the sole determinative factor."); [11] *cf. Wendell C.*

---

**11.** In *McDermott v. Dougherty,* 385 Md. 320, 869 A.2d 751 (2005), we categorized Missouri as a "hybrid" state, applying "a composite" of the best interests of the child and exceptional circumstances standard. Missouri, nevertheless, also has recognized that the length of time a child spends in foster care coupled with bonding with foster parents, is insufficient to terminate parental rights. *See In the Interest of C.A.L.,* 228 S.W.3d 66, 77 (Mo.Ct.App.2007) (reasoning that when a child,

*v. State of Alaska*, 118 P.3d 1, 4–5 (Alaska 2005) (reasoning parents' conduct placed children at substantial risk of harm, warranting termination of parental rights, when parents' attempts to recover from alcoholism failed, parents engaged in domestic violence, and evidence was presented that children suffered from "attachment problems" precluding a lengthy and contingent return to parental custody); *In re A.R.G.*, 2005 WL 457282, 2005 Tenn.App. Lexis 122 (2005) (reasoning conditions persisted that led to the child's removal, warranting termination of parental rights, when mother continued abusing drugs, missed over sixty percent of scheduled visits, and child had bonded with her foster parents "to such a degree that she hardly recognizes Mother").

In the present case, the judge focused primarily on the length of time Alonza and Shaydon had been in foster care and the apparent bond that had developed between Ms. B. and the children, to support a finding of exceptional circumstances. The record does not reflect through evidentiary support, however, how a continued parental relationship would have caused a detriment to the children, and the trial judge made no findings to that effect. Because the record is silent in this regard, and because parental rights are among those deemed fundamental, we cannot say that exceptional circumstances warranted the termination of Mr. D.'s parental rights. Therefore, we will vacate the judgment of the Court of Special Appeals and remand this case to the Circuit Court for further proceedings in which detriment to the children must be explored and explicit findings developed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE JUDGMENT OF CIRCUIT COURT FOR BALTIMORE CITY AND REMAND TO THAT COURT FOR FURTHER PROCEED-**

---

C.A.L. was placed in foster care when he was approximately six months old, and had been in foster care for over three years, it was "almost a foregone conclusion" that C.A.L. would not have as strong of a bond with Mother as he otherwise would).

INGS IN CONFORMANCE WITH THIS OPINION; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.

HARRELL, J., dissents and files opinion.

HARRELL, Judge, dissenting.

I dissent. Unlike Melissa F. in *In re Rashawn H. and Tyrese H.*, 402 Md. 477, 937 A.2d 177 (2007), there is no evidence (or allegation) that Mr. D. suffers from a low IQ or the other burdens that hindered Melissa F. in her attempts to become an acceptable mother to her children. Unlike Mr. McDermott in *McDermott v. Dougherty*, 385 Md. 320, 869 A.2d 751 (2005), there is no evidence (or allegations) that Mr. D.'s absence as an acceptable father to his children was due to the necessity of plying a livelihood as a merchant seaman (or any occupation carrying remotely analogous constraints). Rather, Mr. D.'s relative absence as a parent from the lives of his children and his virtual material non-support of them was due largely to inaction on his part. He created the predicament that he now confronts, i.e., the extensive time the children have been in Ms. B's care and the resultant routing of their affections in the only logical direction offered by the circumstances. Thus, it is indeed exceptional (and perhaps astonishing) that a professedly loving biological parent, with the apparent means to supply proper support, housing, and, had he accessed the parental skills training opportunities offered, the late-acquired, but unfulfilled, desire to be a parent in reality, could let matters moulder to the point that they have in this case. The Department and Ms. B. stepped-up and Mr. D. stepped-back. He cannot simply "park" his children with the State and a third-party custodian and not expect circumstances to work against him, while paying essentially only lip service to parenthood.

A child is entitled to whatever stability in a loving and supportive familial environment that society can muster when parents are unwilling to provide it. Mr. D.'s creation of the opportunity for such an environment to unfold as it has,

allowing the vacuum to continue for eight years, but desiring to unsettle what has been established or leave its continuation in doubt, cannot be tolerated or allowed. That prospect necessarily must be detrimental to the health and well-being of children of the ages of those in this case. I, like the trial judge and the Court of Special Appeals's panel majority, do not require an expert to tell me that.

I would affirm the judgment of the majority opinion of the Court of Special Appeals and that of the Circuit Court for Baltimore City.