J-S45014-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MONTEZ BETHEA, | |
| Appellant | No. 3375 EDA 2018 |

Appeal from the PCRA Order Entered October 19, 2018
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0009460-2011

BEFORE:  BENDER, P.J.E., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:            **FILED NOVEMBER 13, 2019**

Appellant, Montez Bethea, appeals from the post-conviction court's October 19, 2018 order denying his petition filed under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.  After careful review, we affirm.

The PCRA court provides a lengthy summary of the facts and procedural history underlying Appellant's conviction, which we adopt for purposes of this appeal.  *See* PCRA Court Opinion (PCO), 1/28/19, at 1-8.  We only highlight that on April 15, 2016, Appellant filed a timely, *pro se* PCRA petition.  Although the court initially appointed counsel, Appellant ultimately retained a private attorney, who filed two amended petitions on his behalf.  After the court conducted a bifurcated evidentiary hearing on April 27, 2018, and July 20,

_____

[*] Retired Senior Judge assigned to the Superior Court.

2018, it issued an order denying Appellant's petition on October 19, 2018. He filed a timely notice of appeal, and he also timely complied with the PCRA court's order to file a Pa.R.A.P. 1925(b) statement. On January 28, 2019, the PCRA court filed a Rule 1925(a) opinion.

Herein, Appellant states six issues for our review:

I. Was Appellant denied his rights under the Sixth Amendment of the U.S. Constitution and Article 1, sec. 9 of the Pennsylvania Constitution when trial counsel ineffectively advised Appellant not to testify on his own behalf?

II. Was Appellant entitled to relief based upon after[-]discovered evidence that the Commonwealth's key witness, Darryl Rigney, lied when he inculpated [] Appellant in the crime?

III. Was Appellant denied his Sixth Amendment and Article 1, sec. 9 rights when trial counsel ineffectively failed to secure and use … phone records at trial?

IV. Was Appellant denied his rights under the Sixth Amendment of the U.S. Constitution and Article 1, sec. 9 of the Pennsylvania Constitution when counsel ineffectively failed to obtain and use available impeachment evidence?

V. Was Appellant denied his rights under the Sixth Amendment of the U.S. Constitution and Article 1, sec. 9 of the Pennsylvania Constitution when counsel ineffectively failed to object to the trial court['s] using hearsay evidence obtained as part of the Motion to Suppress for truth of the matter asserted at trial?

VI. Was Appellant denied his rights under the Sixth Amendment of the U.S. Constitution and Article 1, sec. 9 of the Pennsylvania Constitution when counsel ineffectively failed to preserve, raise and argue a claim on direct appeal that the trial court erred in denying the Motion to Suppress?

Appellant's Brief at 3.

We have reviewed the certified record, the briefs of the parties, and the applicable law. Additionally, we have reviewed the thorough and well-crafted

opinion of the Honorable Glenn B. Bronson of the Court of Common Pleas of Philadelphia County. We conclude that Judge Bronson's well-reasoned opinion accurately disposes of the issues presented by Appellant.[1] Accordingly, we adopt his opinion as our own and affirm the order denying Appellant's PCRA petition for the reasons set forth therein.

Order affirmed.

_____

[1] We observe, however, that there are two claims raised in Appellant's brief that were not addressed by Judge Bronson. First, Appellant contends that his trial counsel acted ineffectively by advising him not to testify "for purposes of the suppression motion[,]" which was heard by the court simultaneously with Appellant's non-jury trial. *See* Appellant's Brief at 15. In Judge Bronson's opinion, he analyzed only Appellant's related allegation that trial counsel acted ineffectively by advising him not to testify *at trial*. *See* PCO at 12-17. However, Appellant does not point to, and we do not see, where he questioned trial counsel at the PCRA hearing about counsel's allegedly advising him not to testify for purposes of the motion to suppress. Therefore, he has waived this undeveloped claim for our review. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Judge Bronson also did not address Appellant's assertion (which he adds to the end of his fifth issue) "that counsel was ineffective for failing to have the contents of the white bag thrown by Andrews tested for fingerprints." Appellant's Brief at 43. Appellant did not raise this claim in his Rule 1925(b) statement and, therefore, it is waived. Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date:* *11/13/2019*

**FILED**

2019 JAN 28 PM 2: 19

OFFICE OF JUDICIAL RECORDS
CRIMINAL DIVISION
FIRST JUDI. COMMONWEALTH OF

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

             v.

MONTEZ BETHEA

             :
             :
             :
             :
             :
             :
             :

CP-51-CR-0009460-2011

CP-51-CR-0009460-2011 Comm v Bethea, Montez
Opinion

8220016201

OPINION

BRONSON, J:                                    January 28, 2019

On September 11, 2013, following a non-jury trial before this Court, defendant Montez

Bethea was convicted of two counts of murder of the first degree (18 Pa.C.S. § 2502(a)), two

counts of criminal conspiracy (18 Pa.C.S. § 903), two counts of first-degree robbery (18 Pa.C.S.

§ 3701(a)(1)(i)), one count of carrying a firearm without a license (18 Pa.C.S. § 6106(a)(1)), one

count of carrying a firearm on public streets of Philadelphia (18 Pa.C.S. § 6108), one count of

carrying a firearm by a prohibited person (18 Pa.C.S. § 6105(a)),[1] one count of possessing a

controlled substance with intent to deliver (75 Pa.C.S. § 780-113(a)(30)), and one count of

possessing an instrument of crime ("PIC") (18 Pa.C.S. § 907(a)).[2] The Court immediately

imposed the mandatory sentence of life in prison for each murder charge, to run consecutive to

one another (18 Pa.C.S. § 1102(a)(1)).[3]

On December 23, 2014, the Superior Court affirmed defendant's judgment of sentence,

and the Supreme Court denied *allocatur* on June 25, 2015. Defendant filed a *pro se* petition

---

[1] The section 6105 charge required the Commonwealth to prove defendant's prior criminal conviction, which disqualified him from owning a gun, as an element of the offense. The Court severed that charge and heard the evidence regarding it after rendering a verdict on all of the other charges. *See* N.T. 9/11/2013 at 175-178.
[2] Defendant was tried along with co-defendant Rashann James (docket no. CP-51-CR-0009461-2011). By agreement of the parties, the Court heard the evidence relevant to suppression motions filed by the defendants during the waiver trial, rather than in a separate pretrial suppression hearing. *See* N.T. 9/9/2013 at 25-30.
[3] Defendant received no further penalty on all other charges.

1

under the Post Conviction Relief Act ("PCRA") on April 15, 2016. James Lammendola, Esquire was appointed to represent defendant on September 30, 2016. Thereafter, Mr. Lammendola was relieved due to a conflict, and Thomas Kenny, Esquire was appointed on December 30, 2016. On February 27, 2017, defendant retained private counsel Teri Himebaugh, Esquire, who replaced Mr. Kenny. Ms. Himebaugh filed an amended PCRA petition on July 23, 2017, and a supplemental amended PCRA petition on January 5, 2018. In the counseled petitions, defendant claimed that trial counsel, David Rudenstein, Esquire, was ineffective for: 1) advising defendant not to testify in support of his motion to suppress and at trial; 2) failing to obtain and use available impeachment evidence; and 3) failing to object to hearsay evidence. Defendant also claimed that his appellate counsel, who was also Mr. Rudenstein, was ineffective for: 1) failing to argue that the Court erred by admitting hearsay evidence at trial; and 2) failing to argue that the Court erred by denying defendant's motion to suppress. In addition, defendant made two after discovered evidence claims: 1) that the Commonwealth's key witness, Darryl Rigney, lied when he inculpated defendant; and 2) that the Commonwealth withheld exculpatory phone records in violation of *Brady v. Maryland*, or, alternatively, that trial counsel was ineffective for failing to request and use these phone records at trial.

The Commonwealth agreed to an evidentiary hearing on the after discovered evidence claim regarding witness Darryl Rigney. In addition, the Court granted an evidentiary hearing, over the objection of the Commonwealth, on the claim of ineffective assistance of counsel for advising defendant not to testify and the claims regarding phone records. On April 27, 2018, and July 20, 2018, the Court held a bifurcated evidentiary hearing on these issues. At the hearing on April 27, 2018, defendant withdrew his *Brady* claim. *See* N.T. 4/27/2018 at 180. On October 19, 2018, after reviewing the record and post-hearing briefs from both parties, the Court issued

2

findings of fact and conclusions of law and entered an order dismissing defendant's PCRA petition.

Defendant has now appealed the Court's dismissal of his PCRA petition on the grounds that the Court erred: 1) "in finding that after discovered evidence that the Commonwealth's key witness, Darryl Rigney, lied when he inculpated the [defendant] in the crime was not credible and/or did not have merit"; 2) in denying defendant's claim that trial counsel was ineffective for advising him not to testify for purposes of the motion to suppress and at trial; 3) in denying defendant's claim that trial counsel was ineffective for failing to secure and use cell phone records at trial; 4) in denying defendant's claim that trial counsel was ineffective for failing to obtain and use available impeachment evidence; 5) in denying defendant's claim that trial counsel was ineffective for failing to object to hearsay evidence, or that appellate counsel was ineffective for failing to raise the issue on appeal; and 6) in denying defendant's claim that counsel was ineffective for failing "to preserve, raise, and argue a claim for direct appeal that the trial court erred in denying the Motion to Suppress.". Appellant's Concise Statement of Matters Complained of on Appeal ("Statement of Matters") at ¶¶ I-VI.[4]

## I. FACTUAL BACKGROUND

The factual background of this matter is set forth in the Court's original Rule 1925(a) opinion filed in defendant's direct appeal as follows:

> At trial, the Commonwealth presented the testimony of Shonte Smith, Lester Johnson, William Whitehouse, Patricia Guy, Darryl Rigney, Philadelphia Police Officers Charles Kapusniak, Joseph McCabe, Joseph McCauley, Stephen Ratka, Lamont Fox, Reginald Forrest, Jr., and Kenneth Long, Philadelphia Police Detectives Gregory Rodden and Micah Spotwood, Philadelphia Police Corporal Gerard Mertz, Philadelphia Police Captain James Smith, and, by stipulation, the testimony of Dr. Gary Lincoln Collins and Officer Ken Weitman. Co-defendant [Rashann] James presented the testimony of Kuzell Bivins and Tyrik Lark.

---

[4] Defendant's claims have been reordered for ease of analysis.

3

Viewed in the light most favorable to the Commonwealth as the verdict winner, their testimony established the following.

On December 8, 2010, at approximately 11 a.m., defendant Bethea called a friend, Darryl Rigney, and asked him to accompany defendant to buy marijuana. N.T. 9/10/2013 at 115-116. Mr. Rigney said yes, and defendant drove to Mr. Rigney's house in a Crown Victoria. N.T. 9/10/2013 at 116. After he arrived at Mr. Rigney's house, defendant told Mr. Rigney to drive to Mr. James's house, because Mr. James knew people who sold marijuana. N.T. 9/10/2013 at 116. Mr. Rigney drove defendant to Mr. James's house in the Crown Victoria. N.T. 9/10/2013 at 116. When they arrived at the house, defendant got out of the car, met Mr. James at the door, and went inside for a few minutes. N.T. 9/10/2013 at 116-117. The two men then returned to the Crown Victoria in which Mr. Rigney was waiting. N.T. 9/10/2013 at 117.

Once in the car, Mr. James began calling his drug supplier, Jemark Daniel. N.T. 9/10/2013 at 117-120. Mr. Daniel did not answer the phone. N.T. 9/10/2013 at 117. Mr. James then called a friend, Robert Williams, and told him to meet Mr. James at 17th Street and Fairmount Avenue. N.T. 9/10/2013 at 117-119. At that point, Mr. Daniel called Mr. James back and told him that he could come by Mr. Daniel's apartment to buy marijuana. N.T. 9/10/2013 at 119. Mr. Rigney then drove the three men to 17th Street and Fairmount Avenue, where Mr. Williams was waiting. N.T. 9/10/2013 at 120. Mr. Williams had a white Cadillac with him. N.T. 9/10/2013 at 120. Mr. James, defendant, and Mr. Rigney got into the white Cadillac, while Mr. Williams took the Crown Victoria. N.T. 9/10/2013 at 120.

Mr. Rigney drove the white Cadillac to 3001 Redner Street, where Mr. Daniel lived. N.T. 9/10/2013 at 120. Mr. James and defendant got out of the car and went into Mr. Daniel's apartment. N.T. 9/10/2013 at 121-122. Upon entering the apartment, Mr. James and defendant shot and killed Mr. Daniel and his girlfriend, Patranella London, and stole his marijuana and passports from the apartment. Mr. James and defendant then fled the apartment, running back to the Cadillac with a large black garbage bag. N.T. 9/10/2013 at 122. As Mr. Rigney drove the car away from the apartment building, Mr. James said to Mr. Rigney, "I took his shit." N.T. 9/10/2013 at 160.

Mr. Daniel's neighbor, Lester Johnson, heard the gunshots and looked out his window. N.T. 9/10/2013 at 10. He saw the white Cadillac speed off from Mr. Daniel's apartment. N.T. 9/10/2013 at 10. Mr. Johnson wrote down what he could see of the license plate number, which was "HP 7-27." N.T. 9/10/2013 at 11-14. A friend who was with Mr. Johnson called 911, and the police arrived on the scene. N.T. 9/10/2013 at 12, 40, 89. Upon entering the apartment and seeing the bodies of Mr. Daniel and Ms. London, it was immediately apparent to police officers that they were both dead. N.T. 9/10/2013 at 40-41. The paramedics arrived and pronounced both victims. N.T. 9/10/2013 at 41. Mr. Daniel had been

4

shot ten times: twice in the chest, twice in the stomach, four times in the left arm, once in the left thigh, and once in the right thigh. N.T. 9/9/2013 at 160-161. Ms. London had been shot thirteen times: eight times in the back, three times in the left thigh, once in the left arm, and once in the left leg. N.T. 9/9/2013 at 161.

At the same time, Philadelphia Police Officer Charles Kapusniak and his partner, Kenneth Long, were conducting surveillance on the 1800 block of North Judson Street, pursuant to their assignment with the Narcotics Field Unit. N.T. 9/9/2013 at 94. This location was near Redner Street, where the murders had just occurred. At approximately 2:40 p.m., Officer Kapusniak observed a white Cadillac travel southbound on Judson Street before pulling over near 1820 North Judson Street. N.T. 9/9/2013 at 95. Officer Kapusniak saw Darryl Rigney exit the vehicle's driver door, while Mr. James emerged from the front passenger seat and defendant got out of the rear passenger seat. N.T. 9/9/2013 at 95-96. All three men walked to the rear of the Cadillac, and Mr. James removed a large trash bag from the Cadillac's trunk. N.T. 9/9/2013 at 96. The three men then ran into 1820 North Judson Street. N.T. 9/9/2013 at 96.

Thirty seconds after the three men ran into the house on North Judson Street, Officer Kapusniak received a call over police radio from Philadelphia Police Lieutenant James Smith. N.T. 9/9/2013 at 96, 123. Lieutenant Smith informed Officer Kapusniak that there had been a shooting at 3001 Redner Street, and that a white Cadillac containing two or three black males had been seen fleeing the scene. N.T. 9/9/2013 at 96, 123-125; 9/10/2013 at 16-17. Officer Kapusniak radioed for backup, informing Lieutenant Smith that he had just seen a white Cadillac and that three black males had emerged from the Cadillac and run into a house. N.T. 9/9/2013 at 96-97, 199.

Approximately one minute after he radioed for backup, Officer Kapusniak observed two men, later identified as Reginald Andrews and Maurice Morris, walk past his vehicle. N.T. 9/9/2013 at 97-98. Mr. Andrews and Mr. Morris approached 1820 North Judson Street, knocked on the door, and entered the house. N.T. 9/9/2013 at 98. Mr. James then stuck his head out of the door and looked around. N.T. 9/9/2013 at 98. A short time later, a silver Kia sped down the block and parked in the middle of the street in front of the house. N.T. 9/9/2013 at 98-99. Mr. James then ran out of the house, carrying a black duffle bag. N.T. 9/9/2013 at 99. He jumped into the passenger seat of the Kia and threw the duffle bag into the backseat. N.T. 9/9/2013 at 99. The driver of the Kia, later identified as Mohammed Bey, drove down Judson Street at a high rate of speed and turned down Montgomery Avenue, at which point Officer Kapusniak lost sight of the vehicle. N.T. 9/9/2013 at 99-100, 120-121.

After Mr. Bey turned onto Montgomery Avenue, Officer Joseph McCabe and Officer Miles, who were backing up Officer Kapusniak, pulled over the silver Kia based on Officer Kapusniak's description of the car and its license plate number.

5

N.T. 9/9/2013 at 99-100, 163-165.[5] As Officer McCabe approached the passenger side of the vehicle, the passenger door popped open, and Officer McCabe smelled an extremely strong odor of marijuana emanating from the car. N.T. 9/9/2013 at 165. Officer McCabe opened the passenger door the rest of the way, and Mr. James, who was in the passenger seat, immediately said, "Officer, that's my marijuana." N.T. 9/9/2013 at 165-166. Officer McCabe placed Mr. James and Mr. Bey in custody and searched Mr. James's pants pockets, recovering $555 cash. N.T. 9/9/2013 at 166-167, 179-180. Officer McCabe then saw the duffle bag in the backseat, which was open. N.T. 9/9/2013 at 167. The bag contained five clear Ziploc bags of marijuana and a scale. N.T. 9/9/2013 at 167. Officer McCabe radioed Officer Kapusniak and told him that he had apprehended Mr. James and Mr. Bey, and that he had recovered several clear Ziploc bags of marijuana from the duffle bag in the backseat of the Kia. N.T. 9/9/2013 at 100.

While Officer McCabe was apprehending Mr. James and Mr. Bey, Officer Kapusniak had remained at 1820 North Judson Street, surveilling the house. N.T. 9/9/2013 at 100-101. Officer Kapusniak observed Mr. Andrews and Mr. Morris emerge from the house. N.T. 9/9/2013 at 100. Mr. Andrews had a white plastic bag in his hand. N.T. 9/9/2013 at 100. Officer Kapusniak again radioed backup officers and gave them a description of Mr. Andrews and Mr. Morris. N.T. 9/9/2013 at 100. Mr. Andrews and Mr. Morris walked up the block, turning onto Berks Street. N.T. 9/9/2013 at 101.

After Mr. Andrews and Mr. Morris turned onto Berks Street, Officer Joseph McCauley and Officer Aponte began pursuing Mr. Andrews and Mr. Morris on foot, based on the descriptions relayed to them by Officer Kapusniak. N.T. 9/9/2013 at 101.[6] Mr. Morris did not run from the police, and was placed in custody. Mr. Andrews fled, throwing the white plastic bag that he had been carrying over a fence. N.T. 9/9/2013 at 101. Officer McCauley caught up to Mr. Andrews and placed him under arrest. N.T. 9/9/2013 at 191. Officer McCauley then jumped over the fence and retrieved the bag that Mr. Andrews had discarded. N.T. 9/9/2013 at 191. In the bag were a clear Ziploc bag full of marijuana, several empty bags with marijuana residue, a gun holster, a photograph album, and two passports. The passports were later discovered to belong to Mr. Daniel, one of the homicide victims. N.T. 9/9/2013 at 192; 9/10/2013 at 21-22; 9/11/2013 at 85-89.

As Officer McCauley was apprehending Mr. Andrews and Mr. Morris, Officer Kapusniak continued his surveillance of 1820 North Judson Street. N.T. 9/9/2013 at 103. Lieutenant Smith, along with Philadelphia Police Corporal Gerard Mertz and other members of the narcotics team, arrived at the house and informed Officer Kapusniak that two people had been killed in the shooting at 3001 Redner Street. N.T. 9/9/2013 at 103. At that point, the officers heard movement from

---

[5] Officer Miles's first name was not given at trial.
[6] Office[r] Aponte's first name was not given at trial.

6

inside 1820 North Judson Street, and Corporal Gerard Mertz ordered officers to enter the house in order to secure the property. N.T. 9/9/2013 at 202-203. Corporal Mertz, Lieutenant Smith, Officer Kapusniak, Officer Long, and Officer Stephen Ratka entered the house. N.T. 9/9/2013 at 103, 200.

As police entered the house, defendant and Mr. Rigney were sitting in the living room along with a young woman, later identified as Shonte Smith. N.T. 9/9/2013 at 104, 203. Mr. Rigney was sitting in a chair by the front door, while defendant was sitting on a couch on the opposite side of the room. N.T. 9/9/2013 at 40, 104, 226. Next to defendant was a dog cage, on top of which was an unzipped duffle bag. N.T. 9/9/2013 at 104. Inside the duffle bag, clearly visible to the police, were clear Ziploc bags full of marijuana. N.T. 9/9/2013 at 104, 148. Defendant, Mr. Rigney, and Ms. Smith were all placed in custody. From Mr. Rigney's pocket, Officer Ratka recovered the key to the white Cadillac. N.T. 9/9/2013 at 109, 152, 226.

Police performed a protective sweep of the property for other suspects, and awaited a search warrant in order to further search the property. N.T. 9/9/2013 at 104-105, 149, 200, 221; 9/10/2013 at 19-21. As police awaited the warrant, Ms. Smith was sitting in a chair and defendant and Mr. James were sitting on the floor. N.T. 9/10/2013 at 41-42. All three were handcuffed. N.T. 9/9/2013 at 41-43. As he sat on the floor in handcuffs, defendant kicked a pink bag underneath the couch. N.T. 9/10/2013 at 43-44.

After obtaining a search warrant, police searched the entire residence. N.T. 9/9/2013 at 105-106. Police recovered seven clear Ziploc bags full of marijuana from within the open duffle bag and five clear Ziploc bags full of marijuana from within the white trash bag. N.T. 9/9/2013 at 106, 240. Police also recovered the pink bag from underneath the couch, which contained a .357 revolver, a 9-millimeter handgun, and a .45 caliber handgun. N.T. 9/10/2013 at 66.

Police recovered 25 pieces of ballistic evidence from the scene of the murders: eighteen fired cartridge casings and projectiles from a 9-millimeter handgun, four fired cartridge casings from a .45 caliber handgun, two bullets from a .357 revolver, and one bullet jacket of indeterminable caliber. N.T. 9/10/2013 at 66-68. The Firearms Unit matched 11 of the fired cartridge casings to the 9-millimeter gun recovered from the pink bag found in 1820 North Judson Street, one of the fired cartridge casings to the .45 caliber handgun found in the pink bag, and both of the .357 bullets to the .357 revolver found in the pink bag. N.T. 9/10/2013 at 70-71. The medical examiner recovered three 9-millimeter bullets from Ms. London's body, and one 9-millimeter bullet and one .45 caliber bullet from Mr. Daniel's body. N.T. 9/10/2013 at 69. The .45 caliber bullet removed

7

from Mr. Daniel's body was matched to the .45 caliber handgun from the pink bag. N.T. 9/10/2013 at 70.[7]

After obtaining a search warrant for the Cadillac, the police recovered from its trunk the license plate that was registered to the car, which read "HJZ-1543." N.T. 9/10/2013 at 27. The license plate that was affixed to the Cadillac, which was not registered to the car, read "HPG-2737." N.T. 9/10/2013 at 25-26.

The marijuana recovered from 1820 North Judson Street, the marijuana recovered from the Kia, and the marijuana that Mr. Andrews attempted to discard over a fence were all "hydroponic" marijuana, which is particularly expensive, powerful, and pungent-smelling form of drug. N.T. 9/10/2013 at 14, 56. All of this marijuana was identical to the small amount of marijuana that was left behind in the apartment at 3001 Redner Street. N.T. 9/10/2013 at 56.

Trial Court Opinion, filed December 6, 2013, at pp. 2-8.

## II. DISCUSSION

An appellate court's review of a PCRA court's grant or denial of relief "is limited to determining whether the court's findings are supported by the record and the court's order is otherwise free of legal error." *Commonwealth v. Green*, 14 A.3d 114, 116 (Pa. Super. 2011) (internal quotations omitted). The reviewing court "will not disturb findings that are supported by the record." *Id.* Moreover, "where a PCRA court's credibility determinations are supported by the record, they are binding on the reviewing court." *Commonwealth v. White*, 734 A.2d 374, 381 (Pa. 1999) (citing *Commonwealth v. Abu-Jamal*, 720 A.2d 79, 93 (Pa. 1998)).

*A.    After Discovered Evidence*

Defendant claims that the Court erred "in finding that after discovered evidence that the Commonwealth's key witness, Darryl Rigney, lied when he inculpated the [defendant] in the crime was not credible and/or did not have merit." Statement of Matters at ¶ II. At trial, Rigney testified that after co-defendant Rashann James talked to the decedent about purchasing

---

[7] The remaining 9-millimeter and .45 caliber fired cartridge casings and bullets were consistent with the 9-millimeter handgun and the .45 caliber handgun recovered from the bag, but had insufficient markings to positively match the casings to the firearms. N.T. 9/10/2013 at 71.

8

marijuana, defendant, James, and Rigney switched cars with another man and drove to the decedent's apartment on Redner Street in a white Cadillac. N.T. 9/10/2013 at 115-120. He also testified that defendant and James went inside the decedent's apartment and, a few minutes later, ran from the apartment to the car carrying a large garbage bag. N.T. 9/10/2013 at 122. At the evidentiary hearing, Rigney recanted his trial testimony and stated that two other men, and not defendant and James, committed the actions described above.

To obtain relief under the PCRA based on after-discovered evidence, defendant must plead and prove that the evidence: 1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; 2) is not merely cumulative; 3) will not be used solely to impeach the credibility of a witness; and 4) would likely compel a different verdict. 42 Pa.C.S. § 9543(a)(2)(vi); *Commonwealth v. D'Amato*, 856 A.2d 806, 823 (Pa. 2004).

With regard to recantation testimony as after discovered evidence, the Pennsylvania Supreme Court has stated the following:

> [T]his Court has repeatedly "acknowledged the limitations inherent in recantation testimony, which has been characterized as 'extremely unreliable.'" In fact, we have remarked that "[t]here is no less reliable form of proof, especially where it involves an admission of perjury." For that reason, we have emphasized that, when addressing an after-discovered evidence claim premised on recantation testimony, "the PCRA court must, in the first instance, assess the credibility and significance of the recantation in light of the evidence as a whole." "Unless the [PCRA] court is satisfied that the recantation is true, it should deny a new trial."

*Commonwealth v. Small*, 189 A.3d 961, 977 (Pa. 2018) (internal citations omitted).

### *Evidence Presented at the Evidentiary Hearing*

At the evidentiary hearing, defendant presented testimony on this issue from Darryl Rigney. He testified that two men named Carray and Block accompanied him in a white Cadillac and entered the Redner Street apartment, where the robbery and murders were committed. N.T. 4/27/2018 at 56-57. Contrary to his trial testimony, Rigney claimed that

9

defendant and co-defendant James were not in the white Cadillac when he drove to the house on Redner Street. N.T. 4/27/2018 at 56. Instead, Rigney claimed that as he was driving away from the scene of the crime with Carray and Block, he unexpectedly saw defendant on Ridge Avenue and decided to give him a ride. N.T. 4/27/2018 at 57-58, 105. Rigney claimed that shortly thereafter, Carray and Block got out of the car, leaving Rigney with the trash bag containing the marijuana stolen after the murders. N.T. 4/27/2018 at 58, 107. Rigney stated that he then picked up James, and that Rigney, James and defendant then went to the house of defendant's aunt where they emptied out the bag left by Carray and Block, finding the marijuana and three guns. N.T. 4/27/2018 at 106-109. Accordingly, under Rigney's new version of the events, Carray and Block killed the decedents and stole the marijuana, but then left the marijuana and the murder weapons in the car with Rigney. In this version of the events, defendant and James wound up with the guns and drugs only because Rigney fortuitously ran into defendant and James on the street and picked them up in the getaway car after dropping off the real killers.

Rigney also testified that he initially had told detectives that Carray and Block were the murderers, and only told them defendant committed these crimes "[a]fter they persistently, continuously pushed me to say [defendant] did, yeah." N.T. 4/27/2018 at 78; see also 4/27/2018 at 61-62. He also claimed that he told his lawyer and the prosecutor before testifying at defendant's trial that Block and Carray committed the murders and defendant and James did not. N.T. 4/27/2018 at 82.

During cross-examination of Rigney at the hearing, the Commonwealth reviewed Rigney's statement to police in which he had implicated defendant and James. During this line of questioning, Rigney often fell silent for 15 to 20 seconds before answering questions and at times refused to answer questions. See N.T. 4/27/2018 at 90-93, 98-102, 113. He also often

10

contradicted his direct testimony by agreeing that statements he had made to detectives, which conflicted with his recantation, were true. *See* N.T. 4/27/2018 at 90, 93, 96, 99, 100-101, 103.

### *Findings of Fact and Conclusions of Law*

Following the evidentiary hearing, the Court rendered findings of fact and conclusions of law on this issue, in open court, which were, in substance, as follows:

1. Rigney's recantation testimony was completely incredible and did not undermine confidence in the outcome of the trial. His new story appeared to be a total fabrication, and his demeanor and behavior during the hearing rendered his recantation to be unbelievable.

2. Because the Court was not satisfied that the recantation was true, no new trial is warranted. *See Commonwealth v. Small*, 189 A.3d 961, 977 (Pa. 2018).

As the record fully supports the Court's finding that Rigney's testimony was not credible, that finding should not be disturbed. *See Commonwealth v. White*, 734 A.2d 374, 381 (Pa. 1999); *Commonwealth v. Green*, 14 A.3d 114, 116 (Pa. Super. 2011).

### B.     *Ineffective Assistance of Counsel*

Defendant's remaining claims pertain to the alleged ineffectiveness of trial counsel or appellate counsel. Under Pennsylvania law, counsel is presumed to be effective and the burden to prove otherwise lies with the petitioner. *Commonwealth v. Reid*, 99 A.3d 427, 435 (Pa. 2014). To obtain collateral relief based on the ineffective assistance of counsel, a petitioner must show that counsel's representation fell below accepted standards of advocacy and that as a result thereof, the petitioner was prejudiced. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). In Pennsylvania, the *Strickland* standard is interpreted as requiring proof that: (1) the claim underlying the ineffectiveness claim had arguable merit; (2) counsel's actions lacked any reasonable basis; and (3) the ineffectiveness of counsel caused the petitioner prejudice.

11

*Commonwealth v. Miller*, 987 A.2d 638, 648 (Pa. 2009) (citing *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987)). To satisfy the third prong of the test, the petitioner must prove that, but for counsel's error, there is a reasonable probability that the outcome of the proceeding would have been different. *Commonwealth v. Sneed*, 899 A.2d 1067, 1084 (Pa. 2006) (citing *Strickland*, 466 U.S. at 694).

1.    Trial Counsel's Advice Not to Testify

Defendant claims that trial counsel, David Rudenstein, Esquire, was ineffective when he "advised [defendant] not to testify on his own behalf for purposes of the Motion to Suppress and/or for substantive trial purposes." Statement of Matters at ¶ I.[8]

"The decision whether to testify in one's own behalf is ultimately to be made by the accused after full consultation with counsel." *Commonwealth v. Neal*, 618 A.2d 438, 440 (Pa. Super. 1992) (quoting *Commonwealth v. Bazabe*, 590 A.2d 1298, 1301 (Pa. Super. 1991)). In order to establish a claim of ineffective assistance of counsel for failing to call a defendant to the stand, the defendant must establish that: 1) counsel interfered with defendant's freedom to testify; and 2) counsel gave specific advice so unreasonable as to negate a knowing and intelligent decision by the defendant. *Id.*

### Evidence Presented at the Evidentiary Hearing

At the evidentiary hearing, defendant testified on his own behalf and presented the testimony of mitigation counsel, Gary Server, Esquire, and trial counsel, David Rudenstein, Esquire, on this issue.[9]

---

[8] The waiver trial and suppression hearing were conducted simultaneously.
[9] The Commonwealth initially sought the death penalty and Mr. Server was appointed as mitigation counsel. However, the Commonwealth agreed not to seek the death penalty in exchange for defendant agreeing to a waiver trial. Mr. Server was excused after jeopardy attached at the waiver trial. *See* N.T. 4/27/2018 at 9-10.

12

Mr. Server testified that it is his common practice at his initial meetings with defendants to give a presentation during which, among other things, he explains the major decisions, including whether or not to testify, where defendants have the ultimate decision making authority. N.T. 4/27/2018 at 19-20. He further testified that defendant first told him he had an alibi when they met on November 12, 2012, at Philadelphia Industrial Correction Center ("PICC"). N.T. 4/27/2018 at 10-11. According to Mr. Server, who kept contemporaneous notes during the meeting, defendant told him that at the time of the murders on December 8, 2010, defendant was being visited by his parole officer at his home. *Id.* Mr. Server, who was tasked with investigating defendant's alibi, testified that parole records did not corroborate defendant's alibi and that the parole officer actually visited defendant on December 7, 2010. N.T. 4/27/2018 at 13-15. Moreover, Mr. Server testified that he told defendant this information in person on September 1, 2013, at PICC. N.T. 4/27/2018 at 16.

Defendant testified that Mr. Rudenstein informed him that he should not testify because if he did his aggravated assault conviction would come into evidence and because his testimony would conflict with co-defendant James' defense theory. N.T. 4/27/2018 at 146-147. He also testified that he never told Mr. Server that he was meeting with his parole officer on the day of the murders. N.T. 4/27/2018 at 143, 149. He testified that he told Mr. Rudenstein that his alibi was that he met with his parole agent on December 7, 2010, and the agent told him he could not leave his home until 2:00 p.m. N.T. 4/27/2018 at 142. The next day, the day of the murders, defendant claimed he did not leave his home until 2:00 p.m., following the instructions of the parole officer, and that he subsequently took out someone's trash, which ostensibly gave him an alibi. *Id.* Finally, defendant testified that he did not know, and Mr. Rudenstein did not tell him, that the decision of whether or not to testify was ultimately up to him. N.T. 4/27/2018 at 150.

13

During the cross-examination of the defendant, the prosecutor reviewed with defendant the colloquy regarding defendant's right to testify that took place prior to the defense resting. N.T. 4/27/2018 at 150-155. That colloquy, during which defendant was under oath, was as follows:

[The Court]: All right. You can have a seat. Thank you. First of all, let me just verify, have either of you had any drugs, alcohol, medication, anything that would affect your ability to understand what's going on in court today? Mr. Bethea?

[Defendant Bethea]: No.

[The Court]: Mr. James?

[Defendant James]: No.

[The Court]: All right. Each of you have a right under the Fifth Amendment to the Constitution, also under very similar provision in the Pennsylvania Constitution not to testify in this case. And if you decide not to testify, I will be precluded by law from holding that against you in any way. I won't draw any inference adverse to either of you if you decide not to testify. Do you understand that, Mr. Bethea?

[Defendant Bethea]: Yes.

[The Court]: Do you understand that, Mr. James?

[Defendant James]: Yes.

[The Court]: On the other hand, you also have the right to testify, to tell me your side of the story if you so choose, but that right is qualified in this way. Once your counsel rests on your behalf [in] your case, that right will be extinguished, and what I mean by that is the right will be gone forever. You won't be able to come back at a later time and say that you then wanted to testify or that you wanted to testify now, but nobody gave you a chance to do that or your lawyer talked you out of it even though you wanted to do it. If you wanted to raise any kind of concerns about those kinds of things, you need to do that now. Do you understand that, Mr. Bethea?

[Defendant Bethea]: Yes.

[The Court]: Do you understand that, Mr. James?

[Defendant James]: Yes.

[The Court]: There are -- most of the decisions that are made during the course of the trial are entrusted to your lawyers who are excellent attorneys, well versed in the law, but there are a few things that you two as defendants have the final say about. You have the right to decide of course whether to go to trial or not, that's your decision. Whether you have a

14

|  | judge trial or jury trial, that's ultimately your decision. Also whether or not you testify. That's also ultimately your decision. You get the final say on that, but of course nobody with any sense at all would make that decision without speaking to and getting the advice of counsel, but if you had a disagreement with your lawyer about that, you'd have the final say. Do you understand that, Mr. Bethea? |
|---|---|
| [Defendant Bethea]: | Yes. |
| [The Court]: | Do you understand that, Mr. James? |
| [Defendant James]: | Yes. |
| [The Court]: | Have you had a full and fair opportunity to discuss your options with your lawyers? Mr. Bethea? |
| [Defendant Bethea]: | Yes. |
| [The Court]: | Mr. James? |
| [Defendant James]: | Yes. |
| [The Court]: | Having done that, is it your decision not to testify? Mr. Bethea? |
| [Defendant Bethea]: | Yes. |
| [The Court]: | Mr. James? |
| [Defendant James]: | Yes. |
| [The Court]: | Has anybody threatened you in any way or used any force against you or promised you something to get you not to testify in this case? Mr. Bethea? |
| [Defendant Bethea]: | No. |
| [The Court]: | Mr. James? |
| [Defendant James]: | No. |
| [The Court]: | All right. I'm satisfied there's a knowing, intelligent, and voluntary waiver of their rights to testify and I'll accept that. |

N.T. 9/11/2013 at 119-123. Defendant acknowledged that he had understood the Court's instructions to him during the colloquy. N.T. 4/27/2018 at 150-155.

Next, Mr. Rudenstein testified that he did not specifically recall the conversation he had with defendant regarding whether or not he should testify. N.T. 4/27/2018 at 31, 37-38; N.T. 7/20/2018 at 4-5. He testified that, in his 37 years as a criminal defense attorney, it is his common practice to inform defendants of the advantages and disadvantages of testifying, to tell them that they have an absolute right to testify or not to testify, and to inform them that the decision to testify is ultimately up to the defendant himself. N.T. 4/27/2018 at 38-39, 42-44. He

15

also testified that he customarily advises clients who have non *crimen falsi* prior convictions, such as aggravated assault, that such convictions generally cannot be used for impeachment purposes unless a defendant "opens the door" by testifying to something inconsistent with ever having been convicted of such a crime. N.T. 7/20/2018 at 7-10. Further, Mr. Rudenstein testified that if defendant had wanted to testify, he would have called defendant as a witness. N.T. 4/27/2018 at 39-40. Finally, he testified that he tells defendants to answer questions during the colloquy honestly. N.T. 7/20/2018 at 6, 10.

### *Findings of Fact and Conclusions of Law*

Following the evidentiary hearing, the Court rendered findings of fact and conclusions of law on this issue, in open court, which were, in substance, as follows:

1. Defendant's testimony at the evidentiary hearing that was inconsistent with what he stated in his colloquy was not credible. In particular, the Court clearly explained to defendant during the colloquy that he had the absolute authority to decide whether or not to testify and defendant affirmed, under oath, that after full and fair opportunity to discuss his options with Mr. Rudenstein, it was defendant's decision not to testify in this case. N.T. 9/11/2013 at 121-122. Defendant's claim that he never knew he had the final say on this issue, and that he was answering questions during the colloquy based on orders from Mr. Rudenstein, was belied by the record.

2. Defendant's claim that Mr. Rudenstein told him that his aggravated assault conviction would come in if he testified also was not credible. Based on the credible testimony of Mr. Rudenstein, the Court concluded that he correctly advised defendant that the aggravated assault conviction could possibly come in only if defendant opened the door by testifying to something inconsistent with ever having been convicted of that crime. *See Commonwealth v. Murphy*, 182

16

A.3d 1002, 1008 (Pa. Super. 2018) (citation omitted) ("[E]vidence of a non-*crimen falsi* conviction . . . may be admitted into evidence after the defendant raises the issue of his good character.").

3. Attorney Server's testimony that defendant claimed to have an alibi through his parole officer, and that records refuted defendant's claim, was credible. Defendant's contrary testimony was not. That defendant falsely claimed to have an alibi to counsel was a compelling reason to advise him not to testify in this case.

4. Defendant has failed to prove that trial counsel interfered with his freedom to testify and gave specific advice so unreasonable as to negate a knowing and intelligent decision by defendant. *Commonwealth v. Neal.* 618 A.2d 438, 440 (Pa. Super. 1992).

As the record fully supports the Court's finding that Mr. Rudenstein was not ineffective for advising defendant not to testify, that finding should not be disturbed. *See Commonwealth v. White*, 734 A.2d 374, 381 (Pa. 1999); *Commonwealth v. Green*, 14 A.3d 114, 116 (Pa. Super. 2011).

## 2. Failure to Obtain Cell Phone Records

Defendant claims that the Court erred in finding that trial counsel was not ineffective for failing to "secure and use cell phone records at trial to refute Commonwealth evidence placing [defendant] at the scene." Statement of Matters at ¶ III. This claim is without merit.

### *Evidence Presented at the Evidentiary Hearing*

At the evidentiary hearing, defendant testified on his own behalf and presented the testimony of Darryl Rigney, David Rudenstein, Esquire, and Gary Server, Esquire on this issue.

Defendant presented his cell phone records from the day of the murders, and testified as to whom he spoke and the contents of those phone calls. While the murders occurred at around

17

2:00 to 2:30 p.m. on that day,[10] defendant noted that he had an 11 minute call with Darryl Rigney at 2:04 p.m. N.T. 4/27/2018 at 126. Defendant contended that this proved that he was not together with Rigney at the time of the murders. He also noted that he made or received phone calls at 2:22 p.m., 2:24 p.m., and 2:36 p.m., either at the time of, or shortly after, the murders. *See* N.T. 4/27/2018 at 128-130. Defendant testified that the first two phone calls were with his friend, Rafiq Jones, and the latter with his then girlfriend, Joye Lavender. *Id.* He contended that the records regarding these calls were also exculpatory, since he would have been unlikely to make and receive calls unrelated to the crimes around the time of the murders.

Defendant's phone records also documented a 12:52 p.m. phone call with Robert Williams, the man who provided Rigney with the white Cadillac used as the getaway car. N.T. 4/27/2018 at 167-168. This record was highly inculpatory, since it appeared to refute defendant's claim that he did not know Williams at all and had never had contact with him. Defendant addressed this issue by claiming that other people were using his phone on the day of the murders: "A couple people around my way have the phone. They just passed the phone around." N.T. 4/27/2018 at 169.

Defendant testified that when he asked Mr. Rudenstein about his phone records prior to trial, Mr. Rudenstein said "he'd get back with [defendant]," but that Mr. Rudenstein never did. N.T. 4/27/2018 at 164. Mr. Rudenstein did not recall whether defendant told him he was on the phone with Rigney during or close to the time of the murders. N.T. 4/27/2018 at 40. Mr. Server, on the other hand, testified that defendant never claimed to have been on the phone with Rigney around the time of the murders. N.T. 4/27/2018 at 19.

---

[10] The time of the shooting was established by witness Lester Johnson, who heard the gunshots, saw the fleeing Cadillac, and called police. N.T. 9/10/2013 at 10-13. He estimated the time as between 2:00 and 2:30 p.m. N.T. 9/10/2013 at 13. The radio call for gunshots fired went out at 2:32 p.m. N.T. 9/10/2013 at 47.

## Findings of Fact and Conclusions of Law

1. Defendant was not prejudiced, in any manner, by counsel's ostensible failure to use the cell phone records at trial. First, the records were highly inculpatory by establishing that shortly before the murders, defendant spoke with Robert Williams, the man who provided the getaway car, while having denied knowing Williams or having had any contact with him. Moreover, defendant's explanation for how that call took place, that is, that many other people were using his phone on the day in question, undermined all of his other claims regarding the records, since defendant's own testimony established that the calls could have been made with his phone by several other people who were "pass[ing] the phone around." *See* N.T. 4/27/2018 at 169.

2. Moreover, even if defendant did make all of the calls apart from the one to Williams, the records would not exculpate defendant. The evidence was not disputed that Rigney drove the getaway car and did not go into the residence where the murders occurred. Therefore, it is entirely consistent with the Commonwealth's theory that Rigney could have been on the phone with defendant around the time of the murders, with Rigney being in the car and defendant being in the house. Similarly, there is no reason that defendant, who did not drive the getaway car either to or from the scene of the crimes, could not have made or received the three calls described above near the time of the murders.

As the record fully supports the Court's finding that trial counsel was not ineffective for failing to secure and use cell phone records at trial, that finding should not be disturbed. *See Commonwealth v. White*, 734 A.2d 374, 381 (Pa. 1999); *Commonwealth v. Green*, 14 A.3d 114, 116 (Pa. Super. 2011).

19

3. Failure to Obtain Impeachment Evidence

Defendant claims that the Court erred in finding that trial counsel was not ineffective for failing "to obtain and use available impeachment evidence 1) related to Officer Forrest 2) linking the cream Cadillac seen leaving the crime scene to the white Cadillac that drove up to Judson Street and 3) the incomplete crime scene log." Statement of Matters at ¶ IV. "[T]he failure to impeach a witness on a particular ground cannot constitute ineffective assistance of counsel if trial counsel had a reasonable strategy for not so impeaching." *Commonwealth v. Hanible*, 30 A.3d 426, 454 (Pa. 2011) (citing *Commonwealth v. Small*, 980 A.2d 549, 565 (Pa. 2009)).

*a.    Impeachment Evidence Related to Officer Forrest*

Defendant argues that trial counsel was ineffective for failing to obtain and use available impeachment evidence against Officer Forrest. Statement of Matters at ¶ IV. In his Amended Petition, defendant claimed that trial counsel should have impeached Officer Forrest with an out-of-court statement given by Officer Outlaw that was inconsistent with Officer Forrest's testimony. Amended Petition, filed 7/23/2017, at 41-42. However, in order to impeach a witness with a prior inconsistent statement, "there must be evidence that the statement was made or adopted by the witness whose credibility is being impeached." *Commonwealth v. Brown*, 448 A.2d 1097, 1102 (Pa. Super. 1982) (citing *Commonwealth v. Baez*, 431 A.2d 909, 912 (Pa. 1981)). Here, there is no indication that Officer Forrest adopted Officer Outlaw's statement. Accordingly, any attempt to impeach Officer Forrest with Officer Outlaw's statement would have been improper. For that reason, trial counsel could not have been ineffective for failing to attempt to impeach Officer Forrest in that manner.

20

b.      *Impeachment Evidence Linking the Cream Cadillac Seen Leaving the Crime Scene to the White Cadillac that Drove up to Judson Street*

Defendant's next argument is that trial counsel failed to use available impeachment material "that would have challenged the Commonwealth's linking the cream Cadillac seen leaving the crime scene to the white Cadillac that drove up to Judson Street." Amended Petition, filed 7/23/2017, at 43; *see also* Statement of Matters at ¶ IV. Here, defendant is referring to a prior inconsistent statement of witness Lester Johnson, who heard gunshots and saw a white Cadillac fleeing the scene. At trial, Johnson testified that as he witnessed the Cadillac speed away, he wrote down what he could see of the license plate number, that is, "HP 7-27." N.T. 9/10/2013 at 11-14. That was compelling evidence since the license plate number that was actually affixed to the Cadillac parked outside 1820 North Judson Street read "HPG-2737." N.T. 9/10/2013 at 25-26.

The alleged inconsistency pertains to whether Johnson gave the police the slip of paper on which he had recorded the partial license plate on the day of the crime. In particular, defendant notes that at trial, Johnson testified that he gave the slip of paper to the police on the day of the crime, while in his prior statement to police, he said he gave the paper to the police two days after the crime. *See* Amended Petition, filed 7/23/2017, at 43.

Defendant fails to aver how this minor inconsistency could undermine the Commonwealth's case. Johnson was a very compelling witness, whose alert recording of a partial license plate number offered highly probative evidence that the getaway car used for the murders was the car parked in front of the home where defendant was found after the murders. If defense counsel had confronted Johnson with this minor inconsistency in his statement, it would not have diminished Johnson's credibility or otherwise undermined the Commonwealth's case.

21

c.    *Incomplete Crime Log Scene*

Defendant's last claim regarding impeachment material is as follows:

Counsel also failed to use available evidence to impeach Commonwealth witness with the incomplete crime scene log. According to Officer Outlaw, Lt. Bernard told him to change his clothes and to see if the witnesses would come down to homicide. Neither Lt. Bernard or, notably, Officer Outlaw are listed on the crime scene log. Lt. Bernard wasn't even listed on the Commonwealth's potential witness list. Showing that a police investigation was sloppy or incomplete could have only supported [defendant's] assertion that he was an innocent man who was not involved in or even know about the murders and was only with Rigney in that white Cadillac that afternoon in order to buy some marijuana.

Amended Petition, filed 7/23/2017, at 43-44 (footnote omitted).

This argument is without merit. The ostensible omission of two people from a crime scene log, neither of whom testified during the trial, was largely irrelevant. An effort by counsel to bring out this type of minor and inconsequential error in police paperwork could not have affected the outcome of the case.

4.    Failure to Object to Hearsay Evidence

Defendant next claims:

The PCRA Court erred in finding that [defendant] was not denied his rights under the Sixth Amendment of the U.S. Constitution and Article 1, sec. 9 of the Pennsylvania Constitution when trial counsel failed to object to the trial court using hearsay evidence obtained as part of the Motion to Suppress for the truth of the matter asserted at trial; to the extent that this Court found that the claim was preserved at trial, the PCRA Court erred in finding that appellate counsel was not ineffective for failing to present and argue it in the direct appeal.

Statement of Matters at ¶ V.

In his Amended Petition, defendant specifically claimed that some of the Court's factual findings in defendant's substantive case were based on Officer Forrest's hearsay testimony in which he stated that two unidentified witnesses told him they saw two or three black males flee the scene of the crime in a white Cadillac. *See* Amended Petition, filed 7/23/2017, at 44-50.

22

Defendant states that "[d]uring the oral ruling at the conclusion of the trial, the Court held as finding of fact number three, 'information contained in the police radio call was based on a statement from a neighbor who spoke to a police officer and reported what she had seen.'" *Id.* at 49 (quoting N.T. 9/11/2013 at 140). Defendant argues, therefore, that he was "prejudiced by the Court's use of inadmissible hearsay for the truth of the matter asserted [as] a basis for a trial factual finding." *Id.*

Defendant's argument is plainly contradicted by the record. On numerous occasions during the waiver trial and suppression hearing, which were held simultaneously, the Court stated on the record that it was not considering hearsay admitted for purposes of the suppression motion when deciding defendant's guilt. *See* N.T. 9/10/2013 at 90, 96; N.T. 9/11/2013 at 91, 151. In fact, with regards to the statement to which defendant is referring, the Court twice explicitly stated it would not consider the statement when determining defendant's guilt. First, the following exchange took place during the direct testimony of Officer Forrest:

| [The Witness]: | I believe she said three [black males] from the niece, she said three. |
|---|---|
| [Defense Counsel]: | Well, that I would have to object then, Your Honor. Again, if it's for both-- |
| [Prosecution]: | It's not for both, it's for the motion. |
| [The Court]: | I don't think that I would or should and I will not consider this. It's all hearsay. I'm not going to consider it in any manner except with regard to the two pending motions to suppress. |
| [Defense Counsel]: | Thank you, Your Honor. |

N.T. 9/10/2013 at 96. Next, while defense counsel was giving his closing he stated, "It is true, Your Honor, that someone sees two or three black males getting into a white Cadillac over on Redmond Street, but--". N.T. 9/11/2013 at 151. As defense counsel was stating this, the Court interrupted him and said, "Let me just say I wouldn't consider that because that was hearsay and admissible only for purposes of the motion." N.T. 9/11/2013 at 151-152.

23

Finally, finding of fact number three was a finding of fact on the suppression motions, not the waiver trial. The Court made this clear before announcing the findings:

> I'm going to render some Findings of Fact and Conclusions of Law on those motions so that counsel when they make their argument are aware of what evidence is being admitted. Let me just state preliminarily these findings are by a preponderance of the evidence, so I did not mean to foreclose counsel from making any arguments that these findings are inconsistent with proof beyond a reasonable doubt at the guilt stage of my decision.

N.T. 9/11/2013 at 139.

Accordingly, inadmissible hearsay was not considered at all by the Court in determining whether the defendant had been proven guilty. For that reason, neither trial nor appellate counsel were ineffective for failing to raise this issue.

5.    Motion to Suppress

Finally, defendant claims that "trial counsel" was ineffective for failing "to preserve, raise and argue a claim for direct appeal that the trial court erred in denying the Motion to Suppress." Statement of Matters at ¶ VI.[11] Because the suppression motion was without merit, this claim is without merit.

"In reviewing a ruling on a suppression motion, the standard of review is whether the factual findings and legal conclusions drawn therefrom are supported by the evidence." *Commonwealth v. Wholaver*, 989 A.2d 883, 896 (Pa. 2010) (quoting *Commonwealth v. Bronshtein*, 691 A.2d 907, 913 (Pa. 1997)). Additionally, "[w]here the record supports the findings of the suppression court, [the reviewing court is] bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." *Commonwealth v. Ligons*, 971 A.2d 1125, 1148 (Pa. 2009) (citation omitted).

---

[11] Trial counsel also handled the direct appeal in this case. Of course, he could only have been ineffective for failing to raise an issue on appeal in his role as appellate counsel.

24

Here, defendant filed a motion to suppress all of the evidence seized from 1820 North Judson Street, the home where defendant was arrested. Police obtained a search warrant for the premises and conducted a full search of the property pursuant to that warrant. Defendant never challenged the validity of the search warrant and conceded that there was probable cause for the search. However, before the warrant had been secured, police entered the property to conduct a protective sweep of the premises in order to secure the property while awaiting the warrant. The Commonwealth argued that the protective sweep was lawful under the exigent circumstances exception to the warrant requirement. Defendant contended that there were not sufficient exigent circumstances, and therefore, the warrantless entry into the property was unconstitutional.

Under the exigent circumstances exception to the warrant requirement, a warrantless entry into a home may be lawful if justified by both probable cause and exigent circumstances. *See Commonwealth v. Bostick*, 958 A.2d 543, 556-557 (Pa. Super. 2008), *app. denied*, 987 A.2d 543 (Pa. 2009). The relevant factors for the Court to consider are as follows:

> (1) the gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is strong reason to believe that the suspect is within the premises being entered, (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended, (6) whether the entry was peaceable, and (7) the time of the entry, i.e. whether it was made at night. ... Other factors may also be taken into account, such as whether there is hot pursuit of a fleeing felon, a likelihood that evidence will be destroyed if police take time to obtain a warrant, or danger to police or other persons inside or outside the dwelling.

*Commonwealth v. Roland*, 637 A.2d 269, 270-271 (Pa. 1994); *see Bostick*, 958 A.2d at 557.

Here, as stated above, defendant did not dispute the existence of probable cause to search the property. Accordingly, the legality of the initial search turned on whether there were sufficient exigent circumstances to justify the entry into the property before the warrant arrived.

25

After all of the relevant evidence on this issue had been presented, the Court rendered findings of fact and conclusions of law, addressing each of the factors relevant to exigency as set forth by our Supreme Court in *Roland*. *See* N.T. 9/11/2013 at 139-149.

First, as to the gravity of the offense, the Court found that the police reasonably believed that people who were just involved in fatal shootings, a very serious offense, were present in the house. Officer Kapusniak, while conducting a narcotics surveillance, saw a white Cadillac stop near the house and observed three black males, including defendant, enter the home. N.T. 9/9/2013 at 95-96. Around the same time, he received a radio call of a shooting just a few blocks away which described the assailants as two to three black men leaving the scene of the crime in a white Cadillac. N.T. 9/9/2013 at 96, 123-124. Minutes thereafter, Officer Kapusniak observed two different men enter the home and then leave with bags in their hands. N.T. 9/9/2013 at 97, 100. When police asked these men to stop, one of them fled, throwing the bag he was holding over a fence. N.T. 9/9/2013 at 101. That bag was recovered and found to contain marijuana, a gun holster, passports and a photo album. N.T. 9/9/2013 at 100-101, 138. Captain James Smith, who was then a lieutenant, responded to the scene of the crime and saw immediately that two victims had been shot dead. N.T. 9/11/2013 at 14-15. Accordingly, the police had compelling reasons to believe that people involved in two murders were then present in the house.

Second, regarding whether the suspects were armed, the above-described facts made it highly likely that people in the house were armed, since they had just left the scene of a double homicide committed with firearms.

Third, as to the showing of probable cause, as mentioned above, defendant conceded that the evidence clearly established probable cause to believe that the premises contained evidence of a crime.

26

Fourth, as to whether there is a strong reason to believe that the suspects were in the premises to be entered, the police had observed three men, who likely had fled the scene of the killings, enter the premises. It is true that police observed co-defendant James run out of the house and jump into a vehicle, leaving the premises before the protective sweep. N.T. 9/9/2013 at 98-99.[12] However, the police knew that the other two men who had arrived in the Cadillac, including defendant, were still inside.

Fifth, as to whether there is a likelihood that the suspects would escape if not swiftly apprehended, the Court credited the testimony of Captain Smith on this issue. He testified that because co-defendant James, and the two individuals who had left the house with bags, had already been arrested by police, there was good reason to believe that the investigation may have been compromised. N.T. 9/11/2013 at 19-21. Therefore, an attempted escape, accompanied by a possible shootout, was a reasonable concern.

Sixth, as to whether the entry was peaceable, it was undisputed that the police entered the premises through an unlocked open door. N.T. 9/9/2013 at 203.

Finally, as to the time of entry, the evidence showed that entry was made in the afternoon, and not at night. N.T. 9/9/2013 at 189.

Accordingly, the record clearly established that exigent circumstances permitted the police to enter the premises for a limited protective sweep while awaiting the arrival of the search warrant. The police had compelling reasons to believe that people in the home were armed and dangerous, that they had just committed a double murder, that the police investigation may have been compromised due to the arrests of three people who had recently left the

---

[12] The car that James was in was stopped by police and he was arrested with a large bag of marijuana. N.T. 9/9/2013 at 99-100.

27

premises, and that there were real concerns of danger to police and the community should an escape be attempted. For these reasons, the protective sweep was lawful.

Because the record established that the motion to suppress was without merit, appellate counsel could not have been ineffective for failing to raise the issue on direct appeal. No relief is due.

### III. CONCLUSION

For the foregoing reasons, the Court's order dismissing defendant's PCRA Petition should be affirmed.

BY THE COURT:

GLENN B. BRONSON, J.

28

Commonwealth v. Montez Bethea                     CP-51-CR-0009460-2011
Type of Order: 1925(a) Opinion

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa.R.Crim.P.114:

**Defense Counsel/Party:**

Teri B. Himebaugh, Esquire
2201 Pennsylvania Ave, #513
Philadelphia, PA 19130

Type of Service:        ( ) Personal (X) First Class Mail ( ) Other, please specify:

**District Attorney:**

Lawrence Goode, Esquire
Interim Supervisor, Appeals Unit
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107-3499

Type of Service        ( ) Personal ( ) First Class Mail (X) Other, please specify: *Interoffice Mail*

**Additional Counsel/Party:**

Joseph D. Seletyn, Esquire
Prothonotary
Office of the Prothonotary – Superior Court
530 Walnut Street, Suite 315
Philadelphia, PA 19106

Type of Service:        ( ) Personal (X) First Class Mail ( ) Other, please specify:

**Dated: January 28, 2019**

*Thomas Smith*

Thomas R. Smith
Law Clerk to Hon. Glenn B. Bronson